```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
                          EASTERN DIVISION


UNITED STATES OF AMERICA,          )
                                   )
                  Plaintiff,       )
                                   )
         v.                        )       No. 4:11 CR 361 AGF / DDN
                                   )
FRED W. ROBINSON,                  )
                                   )
                  Defendant.       )
```

### REPORT AND RECOMMENDATION

Before the court are the pretrial motions of defendant Fred W. Robinson (a) to dismiss Counts 4 through 8 of the indictment (Doc. 25); (b) to sever Counts 1-3 from Counts 4-8 (Doc. 26); and (3) to suppress evidence (Doc. 27).  A pretrial hearing was held on December 1, 2011.

Defendant Robinson is charged by indictment with 8 counts of offenses:

**Count 1** alleges defendant committed wire fraud in violation of 18 U.S.C. §§ 1343 and 2.  More specifically, Count 1 alleges in part that the Paideia Academy (PA) was a Missouri Charter School for grades K-8, which was sponsored by the Missouri University of Science and Technology. PA was a subsidiary of Paideia Corporation (PC), a non-profit corporation.  (Doc. 1 at 1-2.)  Defendant was Chairman of the Board of Trustees of PA and was involved in the day-to-day operation of PA.  PA operated with and was "funded by substantial Federal education funds and substantial Missouri education funds intended for legitimate school operations." (Id. at 2.)

**Count 1** further alleges that defendant incorporated and was an owner of Paige C. Investments LLC (Paige C.), a Missouri company organized to operate a day care center to be called The Little People's Academy (TLPA).  Defendant and another person planned to operate TLPA in a building at 4028 West Florissant in St. Louis through Paige C.  (Id. at 2-3.)

**Count 1** further alleges that defendant, as Chairman of the Board of Trustees of PA, without the knowledge of the other board members, and in violation of the PA bylaws which required defendant to advise the board

of the conflict of interest that he was an owner of Paige C. which would operate TLPA, approved PA's lending substantial sums of money of PA to TLPA on several occasions for purchasing and rehabilitating the building at 4028 West Florissant. (Id. at 3.)

**Count 1** further alleges that, after the Missouri Department of Education did not approve PA's application to continue its state charter, defendant opened a new bank account in the name of "Paideia Corporation, West Florissant Capital Improvement" (new bank account) and thereafter caused the transfer of PA federal and state funds from PA's account to the new bank account. (Id. at 5.) Defendant, without the knowledge of the PA board of trustees, authorized the disbursement of PA state and federal funds for the development of TLPA at 4028 West Florissant.

**Count 1** further alleges that defendant failed to advise the federal and state governments that he had directed PA federal and state funds for the development of the building at 4028 West Florissant for TLPA. None of the budgets of PA, required by the Missouri Department of Elementary and Secondary Education, included funds for 4028 West Florissant and TLPA. Neither the United States Department of Education, the Missouri Department of Elementary and Secondary Education, nor the Missouri University of Science and Technology approved or authorized the use of PA funds for 4028 West Florissant or TLPA. (Id. at 6.)

**Count 1** alleges that on September 15, 2009, to execute the above-described scheme, defendant caused a wire communication between PA in Missouri to Edvantage Partners in Arizona regarding the payment of an invoice in the amount of $25,000.00 for the development of the 4028 West Florissant building of TLPA, in violation of 18 U.S.C. §§ 1343 and 2.

**Counts 2 and 3** allege, respectively, that between May 1, 2009 and April 30, 2010, and between May 1, 2010 and April 30, 2011, defendant, as Chairman of the Board of PA, which organization had received more than $10,000 in federal funds in the respective year, misapplied monies of PA for the development of TLPA, in violation of 18 U.S.C. § 666(a)(1)(A).

**Counts 4, 5, 6, 7, and 8** allege, respectively, that during each of the calendar years 2006, 2007, 2008, 2009, and 2010, defendant, while an

employee of the St. Louis City Treasurer's Office,[1] obtained approximately $35,360 in each of the alleged years from the Treasurer's Office by submitting false weekly time sheets and by falsely certifying work hours, each count in violation of 18 U.S.C. § 666(a)(1)(A).

### (a) motion to dismiss (Doc. 25)

Defendant Robinson has moved to dismiss Counts 4, 5, 6, 7, and 8 because (1) 18 U.S.C. § 666 is unconstitutional and (2) these counts fail to state an offense.  Fed. R. Crim. P. 12(b)(3)(B).

### Constitutionality of § 666

Defendant argues that Congress exceeded its authority under the Commerce Clause of the Constitution,[2] when it passed 18 U.S.C. § 666.  The portion of § 666 that is relevant to the indictment states:

(a)   Whoever, if the circumstance described in subsection (b) of this section exists–
(1)   being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof–
(A)   embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that–
(i)   is valued at $5,000 or more, and
(ii)  is owned by, or is under the care, custody, or control of such organization, government, or agency . . .

shall be [punished].

(b)   The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

---

[1]These counts of the indictment also allege that the Treasurer's Office of the City of St. Louis during each alleged year received more than $10,000.00 in federal funds.

[2]The relevant parts of the Commerce Clause state: "Congress shall have the power . . . To regulate commerce . . . among the several states . . . ,"  U.S. Const. Art. I, § 8, cl. 3.

18 U.S.C.A. § 666(a)(1)(A), (b).

Defendant argues that § 666 does not substantially affect interstate commerce, and thus jurisdiction is lacking under the Commerce Clause of the Constitution, citing <u>United States v. Lopez</u>, 514 U.S. 549, 558 (1995), and <u>Jones v. United States</u>, 529 U.S. 848 (2000).

Section 666 of Title 18, United States Code, was passed by Congress as part of Title II of a continuing resolution on January 23, 1984, HJ Res 648.  The Supreme Court has recognized that the constitutional authority for Congress to enact § 666(a)(2) is not the Commerce Clause, but the Spending Clause[3] and the Necessary and Proper Clause.[4]  <u>Sabri v. United States</u>, 541 U.S. 600, 605-06 (2004).  The Court stated that Congress is authorized under these clauses of the Constitution to appropriate federal money for the general welfare, and has the corresponding authority to see that tax money is spent for the general welfare "and not frittered away in graft or on projects undermined when funds are siphoned off . . . ."  <u>Id.</u> at 605.  Both subsections of § 666 specifications, (a)(1), alleged in the instant indictment, and (a)(2), at issue in <u>Sabri</u>, are cut from the same constitutional authority of Congress to protect federal funds from criminal dissipation.

Section 666(a)(1)(A) is constitutional.

### Offenses alleged in Counts 4-8

Defendant argues that Counts 4, 5, 6, 7, and 8 fail to allege offenses under 18 U.S.C. § 666(a)(1)(A).  The indictment must allege the essential elements of the offenses charged.  U.S. Const. amends. V and

---

[3]The Spending Clause provides: "The Congress shall have the power . . . To lay and collect taxes, duties, imposts and excises, to pay the debts and provide for the common defense and general welfare of the United States; but all duties, imposts and excises shall be uniform throughout the United States."  U.S. Const. Art. I, § 8, cl. 1.

[4]The Necessary and Proper Clause provides: "The Congress shall have the power . . . To make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the government of the United States, or in any department or officer thereof."  U.S. Const. Art. I, § 8, cl. 18.

VI; Fed. R. Crim. P. 7(c)(1); <u>Hamling v. United States</u>, 418 U.S. 87, 117 (1974); <u>United States v. White</u>, 241 F.3d 1015, 1021 (8th Cir. 2001).

The essential elements of § 666(a)(1)(A) are: (1) the defendant being an agent of an organization, agency, or governmental unit; (2) during a stated period of time intentionally embezzled, stole, obtained by fraud, or otherwise without authority knowingly converted, or intentionally misapplied $5,000 or more; (3) of money belonging to the previously alleged organization, agency, or governmental unit; and (4) the previously alleged organization, agency, or governmental unit received benefits in excess of $10,000 in the alleged one-year period of time pursuant to a federal program involving a grant, contract, or other form of federal assistance. 18 U.S.C.A. § 666(a)(1)(A); <u>United States v. Vitillo</u>, 2004 WL 2496877, at *4 (E.D.Pa. 2004); <u>Eighth Circuit Manual of Model of Jury Instructions (Criminal)</u> § 6.18.666A (West 2011).

Defendant argues that § 666 does not apply to him, because subsection (c) of that section provides, "This section does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business." 18 U.S.C.A. § 666(c). He argues that a plain reading of this subsection prohibits prosecution under § 666(a) based on his receiving a salary for work performed. The government argues that defendant was a person who submitted false weekly time sheets and who received weekly salary money based upon the false time sheets and his falsely certifying the hours he worked. According to the government, an employee who receives salary money for time in which he did not work or perform services is a "ghost" employee who is not receiving bona fide salary or wages, and that such an employment arrangement is not in the usual course of business of the Treasurer's Office.

Defendant argues that <u>United States v. Harloff</u>, 815 F. Supp. 618 (W.D.N.Y. 1993), applies. In <u>Harloff</u>, the district court applied § 666(c) and held that it "prevent[s] making a federal crime out of an employee's working fewer hours than he or she is supposed to work." 815 F. Supp. at 619. Other courts have disputed the correctness of <u>Harloff</u> or question its applicability. <u>E.g.</u>, <u>United States v. Baldridge</u>, 359 F.3d 1126, 1139 (10th Cir. 2009), <u>cert. denied</u>, 129 S.Ct. 2170 (2009)(§

- 5 -

666(c) does not apply where the defendant did work for which he could not have been paid by his county employer); United States v. Vitillo, supra at *8 (holding that the over-reporting of hours actually worked and submitting inaccurate invoices and billing records are not acceptable business practices under § 666(c)); United States v. Abney, 1998 WL 246636, at *2 (N.D.Tex. 1998) (holding that fraudulently altering time sheets for payment was not "bona fide" or "in the ordinary course of business" under § 666(c)) .

In this case the indictment alleges the essential elements of the offenses charged in Counts 4 through 8.  Regarding § 666(c), the indictment alleges in each of these counts that defendant Robinson obtained approximately $35,360 by fraud and otherwise by submitting false weekly time sheets and falsely certifying hours worked.  This indictment is not like the language of the indictment in United States v. Mills, 140 F.3d 630 (6th Cir. 1998), which did not allege the defendant-employees "did not responsibly fulfill the duties associated with their employment."  140 F.3d at 633.

Ultimately, under the allegations of the instant indictment, the undersigned agrees with the Fifth Circuit Court of Appeals: "Whether wages are bona fide and earned in the usual course of business is a question of fact for the jury to decide." United States v. Williams, 507 F.3d 905, 909 (5th Cir. 2007), cert. denied, 553 U.S. 1013 (2008).

The motion to dismiss should be denied.

### (b) motion to sever counts (Doc. 26)

Defendant moves to sever Counts 1-3 for trial separate from Counts 4-8.  The court determines first whether the joinder of the counts in one indictment was proper under Federal Rule of Criminal Procedure 8(a).[5]

---

[5]Federal Rule of Criminal Procedure 8(a) provides:

(a) Joinder of Offenses.  The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged – whether felonies or misdemeanors or both – are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

- 6 -

United States v. Garrett, 648 F.3d 618, 625 (8th Cir. 2011); United States v. Midkiff, 614 F.3d 431, 439-40 (8th Cir. 2010).  Rule 8(a) allows for joinder when the offenses are of the same or similar character, are based on the same act or transaction, or constitute parts of a common scheme or plan.  Garrett, 648 F.3d at 625.  Rule 8(a) should be liberally construed to allow joinder if such advances the efficient administration of justice.  United States v. Little Dog, 398 F.3d 1032, 1037 (8th Cir. 2005).  If joinder is proper under Rule 8(a), the defendant may still seek severance under Rule 14 upon a sufficient showing of prejudice.

Before trial, the court should determine whether joinder is proper by looking only to the allegations on the face of the indictment.  See United States v. Bledsoe, 674 F.2d 647, 655 (8th Cir.), cert. denied, 459 U.S. 1040 (1982).  Otherwise, consideration of the expected trial evidence is at best a speculation.  There may be a substantial expectation as to what the trial evidence will be;[6] but that expectation is mere speculation until the evidence is received by the court at trial.

The government argues that four federal appeals court opinions support its position that the court can consider the proffered nature of the expected trial evidence when deciding whether or not joinder is proper under Rule 8.  See Doc. 33.  These cases do not persuade.

The most recent Eighth Circuit case relied on by the government is United States v. Wadena, 152 F.3d 831 (8th Cir. 1998).  The relevant portions of Wadena stand for the proposition that when the district court considers whether joinder was proper, it should look to the face of the indictment, citing Bledsoe.  152 F.3d at 848.  In that case the district judge referred the issue of joinder to the magistrate judge who concluded from the face of the indictment that joinder was improper regarding defendant Clark.  Id. at 847.  On review, the district judge disagreed and concluded that "the indictment alleged three conspiracies that were

---

Fed. R. Crim. P. 8(a).

[6]At the hearing, the government proffered that it expects to offer many witnesses whose testimony would be relevant to both sets of counts.

a part of a series of acts or transactions, and joinder was proper." Id.
On appeal, the Eighth Circuit ruled that joinder was proper, stating

> [o]n its face, the indictment alleges more than a mere overlap
> in personnel and the common objective of making money.  We
> deem it clear that the indictment alleges Clark participated
> in a series of acts or transactions with the sole purpose of
> furthering a common scheme of using his and others' positions
> in tribal government to access tribal funds and misapply those
> funds for his personal gain.

Id. at 848.  Regarding defendant Wadena's misjoinder argument, the Eighth
Circuit ruled that, even if there was misjoinder, from the record he was
not entitled to relief on appeal because the misjoinder did have a
"substantial and injurious effect or influence on the jury's verdict."
Id. at 849.   Thus, Wadena expressly stands for the proposition that
during the pretrial stage of the case, the district court should assess
the propriety of joinder by considering only the face of the indictment.

The statement of Circuit Judge John R. Gibson, joined by five of the
eight judges of the Eighth Circuit in United States v. Grey Bear, 863
F.2d 572 (8th Cir. 1988), also invoked by the government, provides the
government no safe harbor.  First of all, the ruling of the court was a
five to five affirmance of the district court's decision on misjoinder
and as such provides no precedential value.   863 F.2d at 573.
Nevertheless, Chief Judge Lay and Judge Gibson expressed differing
opinions about whether the face of the indictment controls the
consideration of whether joinder was proper.  Suffice it to say that
Chief Judge Lay's reference to the continuing viability of Bledsoe
sustains the considerations of the undersigned expressed above about why
the court should only look to the face of the indictment to consider the
joinder or misjoinder issue during the pretrial stage of the case.  Even
though Judge Gibson takes issue with the continuing viability of Bledsoe,
it should be noted that he first considered the face of the indictment
and ruled that it was sufficient to establish that joinder was proper in
that case.  Id. at 582-83.

The government has brought to the court's attention opinions from
two other circuits, which the undersigned believes are unpersuasive,
United States v. Halliman, 923 F.2d 873, 883 (D.C. Cir. 1991) (ruling the

- 8 -

government may sustain the propriety of joinder by a pretrial proffering of evidence), and United States v. Dominquez, 226 F.3d 1235, 1241 (11th Cir. 2000)(ruling that justification for joinder may be shown by a pretrial proffer of evidence or by consideration of the actual trial evidence).

For the Eighth Circuit Bledsoe remains applicable law.   The undersigned has looked to the face of the indictment and finds that joinder was proper under Rule 8(a).

The Eighth Circuit has found counts of a "same or similar character" when they "refer to the same type of offenses occurring over a relatively short period of time." Garrett, 648 F.3d at 625.   Counts 1, 2, and 3 can be characterized as engaging in fraudulent activity against the Paideia Academy, during the period of 2009 to early November 2010 for Count 1, and during 2009, 2010, and 2011 for Counts 2 and 3.   Counts 4 through 8 allege in effect that defendant engaged in fraudulent activity against the St. Louis City Treasurer's Office involving its money during 2006, 2007, 2008, 2009, and 2010.   In a very general way, all of the counts in the indictment are of a similar character (obtaining money by fraudulent activity) and the allegations in the indictment temporally overlap. Applying Rule 8(a) liberally, joinder of all counts in one indictment was proper.

Misjoinder or not is but one factor to assess in determining whether severance should be ordered.   Joint trials are favored because they "'conserve state funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of crime to trial.'" United States v. Lane, 474 U.S. 438, 449 (1986) (quoting Bruton v. United States, 391 U.S. 123, 134 (1968)).   The Court must look to the defendant's showing that prejudice would result from joinder and consider whether such prejudice can be avoided at trial.   Very often relevant factors cannot be fully evaluated until during trial, e.g., the effect of limiting instructions, the strength of the government's evidence, and the receipt of evidence not relevant to all counts. United States v. Ghant, 339 F.3d 660, 665-66 (8th Cir. 2003); United States v. Southwest Bus Sales, Inc., 20 F.3d 1449, 1454 n.11 (8th Cir. 1994).

Defendant Robinson argues that evidence of fraud against the Paideia

Academy, relevant to Counts 1-3, would not be admissible on the remaining counts of fraud against the City of St. Louis.  Defendant argues that even a limiting instruction by the court will be ineffective in preventing the jury from considering irrelevant evidence on the respective counts, and this prejudice outweighs the value of any additional efficiency from a joint trial.

While defendant's prejudice argument is strong, the undersigned cannot say at this time that the factors that will appear at trial (limiting instructions and admonitions to the jury, the amount of evidence that needs to be compartmentalized, and the strength of the government's evidence) will or will not be such to reasonably expect the jury to compartmentalize the evidence.

For these reasons, the motion to sever counts should be denied without prejudice to being reasserted at trial upon a sufficient showing of prejudice under Rule 14.

### (c) Motion to suppress evidence (Doc. 27)

Defendant Robinson has moved to suppress the evidence the government developed through the attachment of a Global Position Satellite (GPS) tracker device to his motor vehicle without judicial authorization.

From the evidence adduced during the hearing, the undersigned makes the following findings of fact and conclusions of law:

### FACTS

1.     During the winter of 2009-2010, the federal investigation of Fred Robinson began with information that there was a "ghost" employee on the payroll of the St. Louis City Treasurer's Office.  Investigation by the local public corruption squad of the Federal Bureau of Investigation, corroborated by interviews and physical surveillance, led to focusing on Robinson.  Agents, including case agent Monique Comeau, physically observed Robinson leaving his residence in the City of St.

- 10 -

Louis, get into a blue Chevrolet Cavalier automobile,[7] and go about his daily routine.  Usually, for an entire day of physical surveillance of Robinson, five or six agents would be necessary.

2.   During the early morning hours of January 22, 2010, to facilitate the physical surveillance of Robinson's movements during the day, without first obtaining a court order the agents surreptitiously affixed a Global Position Satellite (GPS) tracker device to the exterior of Robinson's Cavalier.   The device was rectangular in shape, 3 to 4 inches wide, 7 to 8 inches long, and 2 to 3 inches thick.   The tracker was powered by its own battery; no external power from the Cavalier was necessary to operate it.   The tracker used a built-in antenna[8] to receive and to transmit electronic data.   A magnetic component of the tracker allowed it to be affixed to a metal portion of the Cavalier without the use of screws or other mechanical device that required drilling into the body of the vehicle.   The purpose of the tracker was to observe and record the movements and locations, in realtime, of Robinson's Cavalier automobile.

3.   The tracker device was affixed to the undercarriage of the Cavalier when the vehicle was parked on the public street near Robinson's residence.

4.   The GPS tracker device generally received and transmitted data 24 hours of each day from January 22 to March 17, 2010, when it ceased operating.   However, without the agents intending this, on several occasions during this period of time, the device ceased operating of its own accord and then returned to operation on its own, without the efforts of the investigating agents.

---

[7]A record check indicated that this vehicle was registered to Robinson.   During their periods of surveillance, the investigators did not see anyone else drive the vehicle.

[8]To operate properly, the antenna had to "see the sky."   It would not operate properly if it were inside a roofed enclosure.   The antenna could not observe or record conversations within the interior of the Cavalier.   The GPS device could not identify the driver of the Cavalier; it did not affect the operation of the Cavalier in any way.

5.   During the time the GPS device was affixed to the Cavalier, the investigators also conducted physical personal surveillance of the Cavalier.  At no time did the investigating agents have information from any source that the Cavalier had been driven into any garage, including the detached garage located behind Robinson's residence, or onto any driveway.  At no time while it was affixed to the Cavalier was the GPS tracker device serviced by a technician.

6.   At all times, the Cavalier, with the GPS tracker attached, was operated on public streets, observable by passers-by.

7.   When parked near the Paideia Academy building, the Cavalier was always parked on the public street in front of the academy building. The Cavalier was seen parked also outside the location on West Florissant Avenue which was being developed as The Little People's Academy.   The investigating agents never saw the blue Chevrolet Cavalier being driven by Robinson's wife; she was observed driving a different vehicle.

8.   The GPS tracker device was removed surreptitiously from the Cavalier on March 23, 2010, when the vehicle was parked on the public street outside Robinson's residence.  Nothing invasive was done to the Cavalier to remove the tracker device.

9.   During their investigation, the agents observed, and the GPS tracker device indicated, Robinson's daily pattern of activity.  To the understanding of the agents, the information derived from the GPS tracker device corroborated that Robinson's employment time sheets were false.

10.  The agents delayed applying for grand jury subpoenas for Robinson's city employment time sheets until after the GPS tracker device was removed from the Cavalier.

## DISCUSSION

Defendant argues that the evidence obtained by the government from the warrantless operation of the GPS tracker device should be suppressed, because the installation and use of the device violated his rights under the First and Fourth Amendments.

Issues raised in defendant Robinson's motion to suppress are currently before the Supreme Court in United States v. Jones, 131 S. Ct. 3064 (2011), granting cert. to United States v. Maynard, 615 F.3d 544

- 12 -

(D.C. Cir.), <u>reh'g denied sub nom.</u> <u>United States v. Jones</u>, 625 F.3d 766
(D.C. Cir. 2010).


**A.  Fourth Amendment**

The Fourth Amendment to the Constitution protects the "right of the
people to be secure in their persons, houses, papers, and effects,
against unreasonable searches and seizures. . . ." U.S. Const. amend.
IV.  To secure these rights, the Fourth Amendment provides "no Warrants
shall issue, but upon probable cause, supported by Oath of affirmation,
and particularly describing the place to be searched, and the persons or
things to be seized." <u>Id.</u>  The goal of the Fourth Amendment is to ensure
that a search will be carefully tailored to its justifications, and will
not become a wide-ranging exploratory search.  <u>Maryland v. Garrison</u>, 480
U.S. 79, 84 (1987).

<u>1.  Installation of the GPS tracker device</u>

Defendant argues that the installation of the GPS tracker device
onto the exterior of his Cavalier was a search and seizure for which the
agents needed a warrant under the Fourth Amendment.

<u>Search</u>

A "search" occurs within the meaning of the Fourth Amendment when
the government violates (1) a person's subjective expectation of privacy
(2) that society recognizes as objectively reasonable.  <u>Katz v. United
States</u>, 389 U.S. 347, 361 (1967) (Harlan, J., concurring); <u>see also</u> <u>Kyllo
v. United States</u>, 533 U.S. 27, 33 (2001).

The government argues the ruling in <u>United States v. Marquez</u>[9]
controls.  In <u>Marquez</u>, the defendant challenged the warrantless
installation and use of a GPS tracker device that agents had affixed onto
the bumper of a pick-up truck suspected to be involved in drug
trafficking.  <u>Id.</u> at 607.  Agents affixed the GPS tracker device to the
truck's bumper with magnetic strips while the truck was in a Walmart

―――――――――――――――

[9]605 F.3d 604 (8th Cir. 2010).

parking lot.  Id.  During the investigation, the agents accessed the device to change its battery seven times, each time while the truck was parked in a public place.  Id.  The GPS tracker relayed the location of the truck only while the truck was out-of-doors.  Id.  The device was affixed to the truck for a total of six months.  Id. at 607-09.[10]

The Eighth Circuit held that the agents did not need a warrant prior to installing and using the GPS tracker device.[11]  Id. at 609-10.  The court explained, "when police have reasonable suspicion that a particular vehicle is transporting drugs, a warrant is not required when, while the vehicle is parked in a public place, they install a non-invasive GPS tracking device on it for a reasonable period of time."  Id. at 610.  Because installation of the GPS tracker device was non-invasive and because the agents installed the device when the truck was parked in public, installation of the GPS tracker device was not a search.  Id.

The Eighth Circuit's holding in Marquez is consistent with those circuits that have addressed the issue. See United States v. Hernandez, 647 F.3d 216, 220 n.4 (5th Cir. 2011) ("Placing the GPS device under the car was not a search because a car's undercarriage is thrust into the public eye, and thus to examine it does not constitute a search." (citation omitted)); United States v. Cuevas-Perez, 640 F.3d 272, 273 (7th Cir. 2011) (holding the installation and use of a GPS tracker device were not Fourth Amendment searches); United States v. McIver, 186 F.3d 1119, 1226-27 (9th Cir. 1999) (holding the installation of the GPS tracker device was not a Fourth Amendment search because the defendant did not intend to shield the undercarriage of his vehicle from inspection by others and because the officers did not pry into a hidden or enclosed

---

[10]Though not explicitly stated in the Eighth Circuit's opinion, the GPS tracker device remained on the pick-up truck until the end of the agents' investigation, and thus was affixed to the pick-up truck for approximately six months. Brief of Appellee at 9, United States v. Marquez, 605 F.3d 604 (8th Cir. 2010), available at 2009 WL 2955451.

[11]Although the defendant's Fourth Amendment challenge was foreclosed because, as only an occasional passenger in the pick-up truck, he did not have standing to challenge the installation and use of the GPS tracker device, the court alternatively addressed the merits of the defendant's argument as though he had standing.  Marquez, 605 F.3d at 609-10.

area when installing the GPS tracker device).  These holdings are consistent with Supreme Court precedent.  See New York v. Class, 475 U.S. 106, 114 (1986) ("The exterior of a car, of course, is thrust into the public eye, and thus to examine it does not constitute a 'search.'"); United States v. Karo, 468 U.S. 705, 712 (1984) (holding the installation of a beeper hidden in a can was not a search because the beeper itself, while "creat[ing] the potential for an invasion of privacy," actually "conveyed no information that [the defendant] wished to keep private, for it conveyed no information at all").

Here, installation of the GPS tracker device onto defendant Robinson's Cavalier was not a "search" because defendant Robinson did not have a reasonable expectation of privacy in the exterior of his Cavalier. Agents installed the GPS tracker device onto defendant's Cavalier based on a reasonable suspicion that he was being illegally paid as a "ghost" employee on the payroll of the St. Louis City Treasurer's Office. Installation of the GPS tracker device was non-invasive; a magnetic component of the GPS tracker device allowed it to be affixed to the exterior of the Cavalier without the use of screws and without causing any damage to the exterior of the Cavalier.  The GPS tracker device was installed when the Cavalier was on a public street near defendant's residence.  See Marquez, 610 F.3d at 610.  Installation of the GPS tracker device revealed no information to the agents other than the public location of the vehicle.  See Karo, 468 U.S. at 712.  Under these circumstances, installation of the GPS tracker device was not a search within the meaning of the Fourth Amendment.

<u>Seizure</u>

A "seizure" of property occurs under the Fourth Amendment when "there is some meaningful interference with an individual's possessory interest in that property."  Karo, 468 U.S. at 712 (citation omitted). Whether there was a physical trespass is "only marginally relevant to the question of whether the Fourth Amendment has been violated, . . . for an actual trespass is neither necessary nor sufficient to establish a constitutional violation."  Id. at 712-13.

The government argues that the Seventh Circuit addressed this issue in <u>United States v. Garcia</u>.[12]   There, the defendant challenged the police's installation of a GPS "memory tracking unit" that received and stored satellite signals indicating the device's location.  <u>Garcia</u>, 474 F.3d at 995.  The police, after receiving reports and obtaining evidence that the defendant was manufacturing methamphetamine, had affixed the device underneath the rear bumper of the defendant's car without first obtaining a warrant.   <u>Id.</u> at 995-96.  The police later retrieved the device while the car was parked on a public street.  <u>Id.</u> at 955.  Data from the unit led the police to a tract of land, where they discovered equipment and materials used to manufacture methamphetamine.  <u>Id.</u>  While the police were on the property, the defendant arrived in a car, which the police searched and found additional evidence of drug manufacturing. <u>Id.</u>

The Seventh Circuit held the installation of the GPS tracker unit was not a Fourth Amendment seizure.  <u>Id.</u> at 996.  The court reasoned,

> The device did not affect the car's driving qualities, did not draw power from the car's engine or battery, did not take up room that might otherwise have been occupied by passengers or packages, did not even alter the car's appearance, and in short did not "seize" the car in any intelligible sense of the word.

<u>Id.</u>

The Seventh Circuit's holding is consistent with the analyses and conclusions of the other circuits that have addressed the issue.  <u>See</u> <u>Hernandez</u>, 647 F.3d at 220 n.4; <u>United States v. Smith</u>, 387 F. App'x 918, 920-21 (11th Cir. 2010) (per curiam); <u>United States v. Pineda-Moreno</u>, 591 F.3d 1212, 1215 (9th Cir.), <u>reh'g denied</u> 617 F.3d 1120 (9th Cir. 2010); <u>McIver</u>, 186 F.3d at 1127.  These holdings are consistent with Supreme Court precedent.  <u>See</u> <u>Karo</u>, 468 U.S. at 712-13 (holding the placement of a beeper inside a can, although possibly a technical trespass, was not a Fourth Amendment seizure because "[a]lthough the can may have contained an unknown and unwanted foreign object, it [could not] be said that anyone's possessory interest was interfered with in a meaningful way").

---

[12]474 F.3d 994 (7th Cir.), <u>cert. denied</u>, 552 U.S. 883 (2007).

Here, installation of the GPS tracker device onto defendant Robinson's Cavalier was not a "seizure" under the Fourth Amendment. Defendant Robinson's Cavalier was parked on a public street when agents affixed the GPS tracker device; the agents did not trespass onto defendant's property.  The GPS tracker device did not deprive defendant Robinson of dominion and control of his Cavalier, nor did the presence of the GPS tracker device interfere with the electronic components of the Cavalier, draw power from the Cavalier, take up room that might otherwise have been occupied by passengers or packages, or alter the Cavalier's appearance.  Therefore, installation of the GPS tracker device was not a seizure within the meaning of the Fourth Amendment.

### 2.  Use of the GPS tracker device

Defendant also argues that use of the GPS tracker device to obtain location information was a search for which a warrant was required under the Fourth Amendment.

In <u>United States v. Knotts</u>,[13] law enforcement officers grew suspicious of a possible drug manufacturing conspiracy involving the defendant's co-conspirators.  <u>Knotts</u>, 460 U.S. at 278.  After tracking the purchase of chemicals used to manufacture the drugs, officers hid an electronic beeper inside a container of chemicals, which one of the co-conspirators later purchased.  <u>Id.</u>  Using visual surveillance and the beeper's signal, the officers tracked the container from the place of purchase, in Minneapolis, ultimately to the defendant's cabin in Wisconsin.  <u>Id.</u>  After securing a search warrant, the officers executed a search of the cabin, which revealed evidence of drug manufacturing, including the container of chemicals with the beeper hidden inside.  <u>Id.</u> at 279.

The Supreme Court held that the officers' use of the beeper was not a search for which a warrant was required by the Fourth Amendment.  <u>Id.</u> at 281-85.  Noting the reduced expectation of privacy in motor vehicles, the Court explained,

---

[13]460 U.S. 276 (1983).

- 17 -

> A person travelling in an automobile on public thoroughfares
> has no reasonable expectation of privacy in his movements from
> one place to another.  When [the co-conspirator] travelled
> over the public streets he voluntarily conveyed to anyone who
> wanted to look the fact that he was travelling over particular
> roads in a particular direction, the fact of whatever stops he
> made, and the fact of his final destination when he exited
> from public roads onto private property.

Id. at 281-82.  Because the beeper revealed no more information than
visual surveillance from public places would have, the officers were
permitted to rely on the beeper, as "[n]othing in the Fourth Amendment
prohibited the police from augmenting the sensory faculties bestowed upon
them at birth with such enhancement as science and technology afforded
them. . . ."  Id. at 282; see also id. at 285 (noting that "scientific
enhancement of this sort raises no constitutional issues which visual
surveillance would not also raise").  The Court did, however, reserve
ruling on the constitutionality of "twenty-four hour surveillance of any
citizen of this country . . . without judicial knowledge or supervision,"
as that issue was not before the Court.  Id. at 283-84; see also id. at
284 (explaining that "if such dragnet type law enforcement practices .
. . should eventually occur, there will be time enough then to determine
whether different constitutional principles may be applicable").

More directly and recently, the Eighth Circuit addressed the
constitutionality of the warrantless use of a GPS tracking unit in
Marquez.  There, the court held the Fourth Amendment was not implicated
where law enforcement agents used a GPS device to track the defendant's
vehicle for six months without a warrant.  Marquez, 605 F.3d at 610.
Although the court cautioned that "wholesale surveillance" by police
would raise serious concerns, those concerns were not present in the case
before the court:

> In this case, there was nothing random or arbitrary about the
> installation and use of the device.  The installation was non-
> invasive and occurred when the vehicle was parked in public.
> The police reasonably suspected that the vehicle was involved
> in interstate transport of drugs.  The vehicle was not tracked
> while in private structures or on private lands.  The device
> merely allowed the police to reduce the cost of lawful
> surveillance.

Id.

- 18 -

The Seventh and Ninth Circuits have similarly held that the targeted use of a GPS tracker device on the exterior of a suspect's automobile is not a search under the Fourth Amendment. See Garcia, 474 F.3d at 995-98; Pineda-Moreno, 591 F.3d at 1216-17. District courts in other circuits have also found no Fourth Amendment violation where agents use a GPS tracker device without a warrant to track a specific individual's vehicle. See United States v. Narrl, 789 F. Supp. 2d 645 (D.S.C. 2011); United States v. Walker, 771 F. Supp. 2d 803 (W.D. Mich. 2011); United States v. Sparks, 750 F. Supp. 2d 384 (D. Md. 2010).

Conversely, in United States v. Maynard,[14] the Court of Appeals for the District of Columbia Circuit held that the warrantless use of a GPS tracker device violated the Fourth Amendment. Maynard, 615 F.3d at 555-68. There, agents affixed a GPS tracker device to the defendant's Jeep and used it to track the defendant's movements continuously for 28 days. Id. at 558. The court held that the agents' actions fell outside of the scope authorized in Knotts because the GPS tracker device enabled the agents to conduct "twenty-four hour surveillance," the constitutionality of which the Supreme Court had reserved ruling. Id. at 555-56 (quoting Knotts, 460 U.S. at 283).

The court then determined that although the defendant's individual movements were exposed to the public, the entirety of his movements during the month was not. Id. at 558 (reasoning that "unlike one's movements during a single journey, the whole of one's movements over the course of a month is not actually exposed to the public because the likelihood anyone will observe all those movements is effectively nil"). The court also determined that society recognizes an expectation of privacy of information about one's lifestyle, personal affairs, and other intimate matters which are revealed during prolonged, uninterrupted GPS surveillance. Id. at 558-63. On these bases, the court determined the agents' use of the GPS tracker device was a search within the meaning of the Fourth Amendment.

---

[14]615 F.3d 544 (D.C. Cir.), reh'g denied sub nom. United States v. Jones, 625 F.3d 766 (D.C. Cir. 2010), cert. granted, 131 S. Ct. 3064 (2011).

Although Marquez and Maynard appear at odds, careful examination of the Eighth Circuit's holding in Marquez reveals that the courts disagreed in degree, not principle:  Marquez permits warrantless use of a GPS tracker device "for a reasonable period of time" while Maynard prohibits "prolonged" warrantless GPS surveillance.  Marquez, 605 F.3d at 610; Maynard, 615 F.3d at 566.  Thus, Marquez and Maynard both recognize durational limits to warrantless GPS tracking of specific individuals; Marquez permits monitoring for at least six months, while Maynard precludes monitoring for 28 days, if not shorter.

Here, the agents tracked the movement of defendant Robinson's Cavalier for almost three months.  The agents specifically targeted defendant Robinson's Cavalier based on reasonable suspicion that he was a "ghost" employee on the payroll of the St. Louis City Treasurer's Office; the agents were not engaged in "wholesale surveillance."  Under Marquez and the undersigned's reading of Knotts, the agents' use of the GPS tracker device on defendant Robinson's Cavalier for three months was not a search for which the Fourth Amendment required a warrant.

Therefore, the motion to suppress based on Fourth Amendment violations should be denied.

## B.  First Amendment

Defendant Robinson argues that the use of the GPS device violated his right under the First Amendment to keep his associations private, citing NAACP v. Alabama, 357 U.S. 449, 462 (1958), and United States v. Maynard, 615 F.3d 544, 562 (D.C. Cir. 2010).  Defendant also argues that the Fourth Amendment's protection of privacy rights also protects First Amendment associational rights, citing Katz v. United States, 389 U.S. 347 (1967).

The courts that have addressed similar arguments for suppression have held that evidence obtained from GPS surveillance should not be suppressed on First Amendment grounds.  See, e.g., Walker, 771 F. Supp. 2d at 814 (rejecting the defendant's argument that "suppressing a First Amendment freedom constitutes a Fourth Amendment search or seizure"); Sparks, 750 F. Supp. 2d at 387 n.5 (rejecting the defendant's argument for suppression based on a purported violation of his First Amendment

right to free association because "[t]he exclusionary rule is a judicial remedy for violations of the Fourth Amendment, not the First Amendment"); see also Maryland v. Macon, 472 U.S. 463, 468-69 (1985) ("Absent some action taken by government agents that can properly be classified as a 'search' or a 'seizure,' the Fourth Amendment rules designed to safeguard First Amendment freedoms do not apply.")

As discussed above, the agents' use of the GPS tracker device for three months was permitted under Marquez.  There was no constitutional violation.

Therefore, the motion to suppress based on First Amendment violations should be denied.

For these reasons,

**IT IS HEREBY RECOMMENDED** that the motion of defendant Fred W. Robinson to dismiss Counts 4-8 of the indictment(Doc. 25) be denied;

**IT IS FURTHER RECOMMENDED** that the motion of defendant to sever Counts 1-3 for trial separate from Counts 4-8 (Doc. 26) be denied, without prejudice to being refiled upon a sufficient showing of prejudice at trial; and

**IT IS FURTHER RECOMMENDED** that the motion of defendant to suppress evidence (Doc. 27) be denied.

The parties are advised that they have until close of business on January 13, 2012, to file objections to this Report and Recommendation. The failure to file timely objections may waive the right to appeal issues of fact.


 /S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**


Signed on December 27, 2011.

- 21 -