UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )
      v.                       )      No. 4:11 CR 361 AGF / DDN
                               )
FRED W. ROBINSON,              )
                               )
            Defendant.         )

**SECOND PRETRIAL**
**ORDER AND RECOMMENDATION**

This action is before the court upon the pretrial motions of the parties which were referred to the undersigned United States Magistrate Judge under 28 U.S.C. § 636(b).

Pending are the motions of defendant Fred W. Robinson to dismiss (Docs. 25, 52, 66), to sever (Docs. 26, 78), to suppress evidence (Docs. 27, 67), and for change of venue (Doc. 68), and the motion of the government for leave to present additional evidence relating to reasonable suspicion (Doc. 61). Pretrial hearings were held on December 1, 2011, February 17, 2012, and April 12, 2012.

On September 8, 2011, a grand jury returned an indictment against defendant Robinson charging him with eight counts. (Doc. 1.) Defendant filed motions to dismiss (Doc. 25), to sever Count I from the remaining counts (Doc. 26), and to suppress evidence (Doc. 27). On December 27, 2011, the undersigned issued a Report and Recommendation concerning those motions. (Doc. 36.) Thereafter, defendant filed another motion to dismiss. (Doc. 52.)

On February 13, 2012, the matter was referred back to the undersigned for a report and recommended disposition of the newly-filed motion to dismiss (Doc. 52) and a supplemental report and recommendation regarding defendant's motion to suppress (Doc. 27) in light of the Supreme Court's opinion in United States v. Jones.[1] (Doc. 54.) This Order and Recommendation replaces in its entirety the Report and

---

[1]132 S. Ct. 945 (2012).

Recommendation filed on December 27, 2011 (Doc. 36). This Order and Recommendation is founded upon the entire record of this action, including the evidence adduced upon which the original Report and Recommendation was based.[2]

On February 23, 2012, a grand jury returned a superseding indictment charging defendant Robinson with eight counts. (Doc. 57.) Thereafter, defendant filed motions to dismiss (Doc. 66), to suppress evidence (Doc. 67), for change of venue (Doc. 68), and to sever (Doc. 78).

Defendant Robinson is charged by the superseding indictment with eight counts of offenses:

**Count I** alleges that defendant was the Chairman of the Board of Trustees of the Paideia Academy (PA), a Missouri Charter School for grades K-8, which was sponsored by the Missouri University of Science and Technology. PA was a wholly-owned subsidiary of the Paideia Corporation (PC), a non-profit corporation. Defendant maintained an office at PA's administration building and was involved in the day-to-day operation of PA. PA was "funded by substantial Federal education funds and substantial Missouri education funds intended for legitimate school operations." (Doc. 57 at 1-2.)

**Count I** further alleges that defendant and a friend, Latasha P., organized and incorporated Paige C. Investments, LLC (Paige C), a Missouri company, for the purpose of operating a day care center, which was to be called The Little People's Academy (TLPA). Defendant and Latasha P. planned to operate TLPA in a building at 4028 West Florissant Avenue in St. Louis through Paige C. Defendant registered TLPA with the State of Missouri and listed his residence at 8726 Partridge Avenue, St. Louis, Missouri, as TLPA's business address. (Id. at 2.)

**Count I** further alleges that defendant, as Chairman of the PA Board of Trustees and in violation of PA's bylaws, directed that a resolution be passed by PA's Board of Trustees approving a $150,000.00 loan to TLPA for the acquisition and rehabilitation of the building located at 4028

---

[2]Thus, some findings of fact and conclusions of law found in the original Report and Recommendation are restated and some may be modified in this Order and Recommendation.

West Florissant Avenue, and for the operation of a day care center at that location. In violation of PA's bylaws, defendant failed to advise PA's Board of Trustees of his material financial interest in the transaction, in that he was a co-owner of Paige C, which was going to operate TLPA. (<u>Id.</u> at 3.)

**Count I** further alleges that on several occasions defendant subsequently directed, authorized, and approved the lending of substantial sums of PA's money to TLPA for the purpose of purchasing the property and rehabilitating the building at 4028 West Florissant Avenue. (<u>Id.</u> at 4.)

**Count I** further alleges that after the Missouri Department of Education determined not to approve PA's application to continue its state charter, defendant opened a bank account in the name of "Paideia Corporation, West Florissant Capital Improvement" (new bank account) and caused the transfer of PA federal and state funds to the new bank account. Defendant, without the knowledge of the PA Board of Trustees, authorized the disbursement of PA state and federal funds from the new bank account for the construction and renovation of TLPA at 4028 West Florissant Avenue. (<u>Id.</u> at 4-6.)

**Count I** further alleges that defendant failed to advise the federal and state governments that he had directed PA federal and state funds for the development of the building at 4028 West Florissant for TLPA. None of the budgets submitted by PA, required by the Missouri Department of Elementary and Secondary Education, included funds for 4028 West Florissant or TLPA. At no time did the United States Department of Education, the Missouri Department of Elementary and Secondary Education, or the Missouri University of Science and Technology approve or authorize the use of PA funds for 4028 West Florissant or TLPA. (<u>Id.</u> at 6.)

**Count I** alleges that on September 15, 2009, to execute the above-described scheme, defendant knowingly caused a wire communication between PA in Missouri and Edvantage Partners in Arizona regarding a $25,000.00 invoice from Select Construction Services, LLC, for the development of the 4028 West Florissant building of TLPA, in violation of 18 U.S.C. §§ 1343 and 2. (<u>Id.</u> at 6-7.)

**Counts II and III** allege, respectively, that between May 1, 2009 and April 30, 2010, and between May 1, 2010 and April 30, 2011, defendant, as Chairman of the Board of Trustees of PA, which organization had received more than $10,000.00 in federal funds during each respective year, misapplied at least $5,000.00 in property and funds of PA for the development of TLPA, in violation of 18 U.S.C. § 666(a)(1)(A). (Id. at 7-8.)

**Counts IV, V, VI, VII, and VIII** allege, respectively, that during each of the calendar years of 2006, 2007, 2008, 2009, and 2010, defendant, "being an agent of an organization, that is, the City of St. Louis as an employee of the [St. Louis City] Treasurer's Office," which received over $10,000.00 in federal funds during each calendar year, obtained approximately $35,360.00 in each of the alleged years from the Treasurer's Office by submitting false weekly time sheets falsely certifying work hours, each count in violation of 18 U.S.C. §§ 666(a)(1)(A) and 2. (Id. at 9-12.)

## I. MOTIONS TO DISMISS

Defendant Robinson moves to dismiss Counts IV-VIII from the superseding indictment, arguing that (1) § 666 is unconstitutional; (2) these counts fail to state an offense; and (3) the court lacks subject matter jurisdiction over these counts. (Docs. 25, 52, 66.)

The portion of § 666 relevant to the superseding indictment states:

(a) Whoever, if the circumstance described in subsection (b) of this section exists–

(1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof––

(A) embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies property that––

(i) is valued at $5,000 or more, and

(ii) is owned by, or is under the care, custody, or control of such organization, government, or agency; []

- 4 -

. . .

... shall be [punished].

(b) The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

(c) This section does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business.

Section 666(a)-(c).

## A. Constitutionality of § 666

Defendant Robinson argues that Congress exceeded its authority under the Commerce Clause of the Constitution when it passed 18 U.S.C. § 666. Specifically, defendant argues that § 666 does not substantially affect interstate commerce and as such, congressional jurisdiction is lacking under the Commerce Clause of the Constitution, citing <u>United States v. Lopez</u>[3] and <u>Jones v. United States</u>.[4]

The Supreme Court has recognized that the constitutional authority for Congress to enact § 666(a)(2) is not the Commerce Clause, but the Spending Clause and the Necessary and Proper Clause. <u>Sabri v. United States</u>, 541 U.S. 600, 605-06 (2004). In <u>Sabri</u>, the Court stated that Congress is authorized under these clauses of the Constitution to appropriate federal money for the general welfare, and has the corresponding authority to see that tax money is spent for the general welfare "and not frittered away in graft or on projects undermined when funds are siphoned off . . . ." <u>Id.</u> at 605. Both § 666(a)(1), alleged in the instant indictment, and (a)(2), at issue in <u>Sabri</u>, are cut from the same constitutional authority of Congress to protect federal funds from criminal dissipation.

---

[3]514 U.S. 549, 558 (1995).

[4]529 U.S. 848, 850-57 (2000).

Therefore, § 666(a)(1)(A) is constitutional.

## B.  Offenses Alleged in Counts IV-VIII

Defendant Robinson also argues that Counts IV-VIII fail to allege offenses under 18 U.S.C. § 666(a)(1)(A).  The indictment must allege the essential elements of the offenses charged.  U.S. Const. amends. V and VI; Fed. R. Crim. P. 7(c)(1); Hamling v. United States, 418 U.S. 87, 117 (1974); United States v. White, 241 F.3d 1015, 1021 (8th Cir. 2001).

To state a violation of § 666(a)(1)(A), the government must allege four elements: (1) the defendant was an agent of an organization, agency, or governmental unit; (2) during the period charged, the defendant embezzled, stole, fraudulently obtained, knowingly converted without authority, or intentionally misapplied property valuing $5,000 or more; (3) the property was owned by, or under the care, custody, or control of the organization, agency, or governmental unit; and (4) the organization, agency, or governmental unit received benefits in excess of $10,000 in the one-year period charged, pursuant to a federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of federal assistance.  18 U.S.C. § 666(a)(1)(A) and (b); United States v. Vitillo, No. CR. 03-555, 2004 WL 2496877, at *4 (E.D. Pa. Nov. 2, 2004); cf. Eighth Circuit Model Jury Instruction (Criminal) § 6.18.666A (2011).

Defendant argues that § 666 does not apply to him, because a plain reading of subsection (c) prohibits prosecution under § 666(a) based on his receiving a salary for work performed.  The government argues that defendant was a person who submitted false weekly time sheets and who received weekly salary money based upon the false time sheets falsely certifying the hours he worked.  According to the government, an employee who receives salary money for time in which he did not work or perform services is a "ghost" employee who is not receiving bona fide salary or wages, and that such an employment arrangement is not in the usual course of business of the Treasurer's Office.

Defendant argues that United States v. Harloff[5] applies.  In Harloff, the district court applied § 666(c) and held that it "prevent[s]

_____

[5]815 F. Supp. 618 (W.D.N.Y. 1993).

making a federal crime out of an employee's working fewer hours than he or she is supposed to work . . . ." 815 F. Supp. at 619. Other courts have disputed the correctness of <u>Harloff</u> or questioned its applicability. <u>E.g.</u>, <u>United States v. Baldridge</u>, 559 F.3d 1126, 1139 (10th Cir.), <u>cert. denied</u>, 129 S. Ct. 2170 (2009) (holding that § 666(c) does not apply where the defendant did work for which he could not have been paid by his county employer); <u>Vitillo</u>, 2004 WL 2496877, at *8 (holding that the over-reporting of hours actually worked and submitting inaccurate invoices and billing records are not acceptable business practices under § 666(c)); <u>United States v. Abney</u>, No. CRIM. 3-97-CR-260-R, 1998 WL 246636, at *2 (N.D. Tex. Jan. 5, 1998) (holding that fraudulently altering time sheets for payment was not "bona fide" or "in the ordinary course of business" under § 666(c)).

In this case the indictment alleges the essential elements of the offenses charged in Counts IV-VIII. Regarding § 666(c), the indictment alleges in each one of these counts that defendant Robinson obtained approximately $35,360 by fraud and otherwise submitting false weekly time sheets falsely certifying hours worked. This indictment is not like the language of the indictment in <u>United States v. Mills</u>,[6] which did not allege that the defendant-employees "did not responsibly fulfill the duties associated with their employment." 140 F.3d at 633.

Ultimately, in assessing the allegations of the instant indictment, the undersigned agrees with the Fifth Circuit Court of Appeals: "Whether wages are bona fide and earned in the usual course of business is a question of fact for the jury to decide." <u>United States v. Williams</u>, 507 F.3d 905, 909 (5th Cir. 2007), <u>cert. denied</u>, 553 U.S. 1013 (2008).

Therefore, the motion to dismiss (Doc. 25) should be denied.

## C. Subject Matter Jurisdiction

In Counts IV-VIII, defendant is charged with violating 18 U.S.C. § 666(a)(1)(A), which criminalizes theft or bribery concerning programs receiving federal funds. (Doc. 57 at 9-12.) Defendant argues that the court lacks subject matter jurisdiction over these counts because his

---

[6]140 F.3d 630 (6th Cir. 1998).

employer, the St. Louis City Treasurer's Office, did not receive in excess of $10,000 in federal funds during each of the respective calendar years, as required by 18 U.S.C. § 666(a)(1)(b).[7]

As set forth above, to establish a violation of § 666(a)(1)(A), the government must show that the organization, agency, or governmental unit received benefits in excess of $10,000 in the one-year period charged, pursuant to a federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of federal assistance. 18 U.S.C. § 666(a)(1)(A) and (b); Vitillo, 2004 WL 2496877, at *4; cf. Eighth Circuit Model Jury Instruction (Criminal) § 6.18.666A (2011).

> Counts IV-VIII of the superseding indictment allege that defendant, being an agent of an organization, that is, the City of St. Louis as an employee of the Treasurer's Office, said organization having received during [each respective one-year period] federal funds in excess of $10,000 through grants from the United States Department of Housing and Urban Development, embezzled, stole, obtained by fraud, and intentionally misapplied property and funds worth at least $5,000 owned by, and under the care, custody, and control of the City of St. Louis, that is[,] defendant submitted false weekly time sheets falsely certifying hours worked and defendant was paid by the City of St. Louis based upon those false weekly time sheets and falsely certified work hours approximately $35,360.

(Doc. 57 at 9-12.)

Defendant's argument concerns the indictment's factual allegation that he was an employee of the City of St. Louis by virtue of his employment with the City Treasurer's Office. This argument, however, is more properly construed as a challenge to the sufficiency of the government's evidence; the court has subject matter jurisdiction over Counts IV-VIII on the basis of defendant being "charged with an 'offense against the laws of the United States.' " United States v. Sabri, 326

---

[7]Defendant previously moved to dismiss Counts IV-VIII of the original indictment, arguing that the court lacked subject matter jurisdiction because the "federal program" alleged in the original indictment was a contractual agreement between the Treasurer's Office and the United States Courts. (Doc. 52.) Because the superseding indictment does not include this factual allegation and instead alleges that the "federal program" at issue is the City of St. Louis's receipt of grants from the United States Department of Housing and Urban Development (Doc. 57 at 9-12), this motion to dismiss (Doc. 52) is moot.

F.3d 937, 939 n.3 (8th Cir. 2003) (quoting 18 U.S.C. § 3231), aff'd, 541 U.S. 600 (2004); see United States v. Jackson, 313 F.3d 231, 233 (5th Cir. 2002) (explaining, in rejecting a jurisdictional challenge to whether a city department received $10,000 in federal funds, that "[t]he indictment sufficiently invoked the district court's jurisdiction, alleging violations of 18 U.S.C. § 666, including the allegation that the [city] received federal funds in excess of $10,000 for each calendar year at issue" and that "[t]he district court had jurisdiction over the case because a violation of federal law was charged . . . regardless of the sufficiency of the Government's proof"); cf. Redzic v. United States, No. 1:11 CV 133 ERW, 2012 WL 447276, at *4 (E.D. Mo. Feb. 13, 2012) (clarifying that the requirement in § 666(a)(2) that "the object of a bribe involve anything of value of $5,000 or more" is an element of the offense, not a requirement for the court's subject matter jurisdiction).

As a challenge to the sufficiency of the government's evidence, defendant's motion is not properly raised at this time. "[S]o long as the indictment [is] facially sufficient . . . , federal criminal procedure does not 'provide for a pre-trial determination of sufficiency of the evidence.' " United States v. Ferro, 252 F.3d 964, 968 (8th Cir. 2001) (quoting United States v. Critzer, 951 F.2d 306, 307-08 (11th Cir. 1992)). An indictment is facially sufficient if it contains "all of the essential elements of the offense charged, fairly informs the defendant of the charges against which he must defend, and alleges sufficient information to allow a defendant to plead a conviction or acquittal as a bar to a subsequent prosecution." United States v. Sohn, 567 F.3d 392, 394 (8th Cir. 2009) (citations omitted); see Fed. R. Crim. P. 7(c)(1) (stating that the indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged").

In this case, defendant Robinson is charged in Counts IV-VIII with violating 18 U.S.C. §§ 666(a)(1)(A) and 2. As to each of these counts, the indictment alleges all of the four essential elements of a violation of § 666(a)(1)(A), namely, (1) defendant was an agent of the City of St. Louis by virtue of his employment with the City Treasurer's Office; (2) during each of the one-year periods, defendant embezzled, stole,

obtained by fraud, and intentionally misapplied funds worth at least $5,000; (3) these funds were owned by and under the care, custody, and control of the City; and (4) the City received more than $10,000 in federal funds during the each of the one-year periods through grants with the United States Department of Housing and Urban Development. (Doc. 57 at 9-12.) The indictment specifically describes defendant's employment with the Treasurer's Office and specifically alleges the years in which defendant falsely certified work hours in his weekly time sheets. Thus, the indictment is legally sufficient on its face.

Moreover, defendant relies on evidence outside of the indictment in arguing that the Treasurer's Office is an independent office statutorily removed from the control of the Mayor of the City of St. Louis, and that he has no ability to control City funds or to bind the City. At this stage of the proceedings, however, the factual allegations in the indictment must be accepted as true. <u>United States v. Sampson</u>, 371 U.S. 75, 78-79 (1962). The court should not look outside the indictment to resolve factual disputes in a pretrial motion. <u>E.g.</u>, <u>United States v. Lafferty</u>, 608 F. Supp. 2d 1131, 1137 (D.S.D. 2009). Defendant's argument "would be more appropriately presented as a defense at trial or in a motion for acquittal after the Government has finished its case." <u>United States v. Siers</u>, No. CR 11-30131-RAL, 2011 WL 6826805, at *2 (D.S.D. Dec. 28, 2011) (citing <u>Ferro</u>, 252 F.3d at 968 ("We simply cannot approve dismissal of an indictment on the basis of predictions as to what the trial evidence will be." (quotation omitted))).

Therefore, the motion to dismiss (Doc. 66) should be denied.

## II. MOTIONS TO SEVER

Defendant Robinson moves to sever Counts I-III of the indictment for a trial separate from Counts IV-VIII.[8] (Docs. 26, 78.)

---

[8]In his motion, defendant incorporates his previously-filed motion to sever (Doc. 26) and his arguments made in his objections to the first Report and Recommendation (Doc. 46). In its response (Doc. 82), the government adopts its previous-filed responses to defendant's motion to sever (Doc. 29) and to defendant's objections (Doc. 53).

The court determines first whether joinder of the counts in one indictment was proper under Federal Rule of Criminal Procedure 8(a).[9] United States v. Garrett, 648 F.3d 618, 625 (8th Cir. 2011); United States v. Midkiff, 614 F.3d 431, 439-40 (8th Cir. 2010). Rule 8(a) allows for joinder when the offenses are of the same or similar character, are based on the same act or transaction, or constitute parts of a common scheme or plan. Garrett, 648 F.3d at 625. Rule 8(a) should be liberally construed to allow joinder if such advances the efficient administration of justice. United States v. Little Dog, 398 F.3d 1032, 1037 (8th Cir. 2005). If joinder is proper under Rule 8(a), the defendant may still seek severance under Rule 14[10] upon a sufficient showing of prejudice. Fed. R. Crim. P. 14(a).

Before trial, the court should determine whether joinder is proper by looking only to the allegations on the face of the indictment. United States v. Bledsoe, 674 F.2d 647, 655 (8th Cir.), cert denied, 459 U.S. 1040 (1982). Otherwise, consideration of the expected trial evidence is speculative at best. There may be a substantial expectation as to what the trial evidence will be; but that expectation is mere speculation until the evidence is received by the court at trial.

---

[9]Federal Rule of Criminal Procedure 8(a) states:

(a) Joinder of Offenses. The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged--whether felonies or misdemeanors or both--are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

Fed. R. Crim. P. 8(a).

[10]Federal Rule of Criminal Procedure 14(a) states:

(a) Relief. If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

Fed. R. Crim. P. 14(a).

The government argues that four federal courts of appeals' opinions support its position that the court can consider the proffered nature of the expected trial evidence when deciding whether joinder is proper under Rule 8.  <u>See</u> (Doc. 33.)  These cases do not persuade.

The most recent Eighth Circuit case relied on by the government is <u>United States v. Wadena</u>.[11]  The relevant portions of <u>Wadena</u> stand for the proposition that when the district court considers whether joinder was proper, it should look to the face of the indictment.  152 F.3d at 848 (citing <u>Bledsoe</u>, 674 F.2d at 655).  In <u>Wadena</u>, the district judge referred the issue of joinder to the magistrate judge, who concluded from the face of the indictment that joinder was improper regarding defendant Clark.  152 F.3d at 847.  On review, the district judge disagreed, concluding that "the [i]ndictment alleged three conspiracies that were a part of a series of acts or transactions, and joinder was proper."  <u>Id.</u> On appeal, the Eighth Circuit ruled that joinder was proper, stating:

> On its face, the [i]ndictment alleges more than a mere overlap in personnel and the common objective of making money.  We deem it clear that the [i]ndictment alleges Clark participated in a series of acts or transactions with the sole purpose of furthering a common scheme of using his and others' positions in tribal government to access tribal funds and misapply those funds for his personal gain.

<u>Id.</u> at 848.  Regarding defendant Wadena's misjoinder argument, the Eighth Circuit ruled that, even if there was misjoinder, Wadena was not entitled to relief on appeal because based on the record, misjoinder did not have a "substantial and injurious effect or influence on the jury's verdict." <u>Id.</u> at 849.  Thus, <u>Wadena</u> expressly stands for the proposition that during the pretrial stage of the case, the district court should assess the propriety of joinder by considering only the face of the indictment.

The statement of Circuit Judge John R. Gibson, joined by five of the eight judges of the Eighth Circuit in <u>United States v. Grey Bear</u>,[12] also invoked by the government, provides the government no safe harbor. There, the ruling of the court was a five-to-five affirmation of the

---

[11]152 F.3d 831 (8th Cir. 1998).

[12]863 F.2d 572 (8th Cir. 1988) (en banc).

district court's decision on misjoinder and, as such, provides no precedential value. 863 F.2d at 573. Nevertheless, Chief Judge Lay and Judge Gibson expressed differing opinions on whether the face of the indictment dictates the propriety of joinder. Suffice it to say that Chief Judge Lay's reference to the continuing viability of Bledsoe sustains the considerations of the undersigned, expressed above, as to why the court should look only to the face of the indictment to consider the joinder or misjoinder issue during the pretrial stage of the case. Even though Judge Gibson takes issue with the continuing viability of Bledsoe, it should be noted that he first considered the face of the indictment and ruled that it was sufficient to establish that joinder was proper in that case. Id. at 582-83.

The government also cites to United States v. Halliman, 923 F.2d 873, 883 (D.C. Cir. 1991) (holding that the government may sustain the propriety of joinder by a pretrial proffering of evidence), and United States v. Dominguez, 226 F.3d 1235, 1241 (11th Cir. 2000) (holding that the justification for joinder may be shown by a pretrial proffer of evidence or by consideration of the actual trial evidence). The undersigned believes these opinions are unpersuasive because Bledsoe remains the applicable law for the Eighth Circuit. See, e.g., United States v. Patzer, No. CR 07-30100-KES, 2008 WL 4533638, at *3 (D.S.D. Oct. 2, 2008) (relying on Bledsoe and noting that "[t]he most recent statement on the issue in the Eighth Circuit holds that an indictment must reveal on its face a proper basis for joinder" (internal quotation omitted)); United States v. Sandstrom, No. 05-00344-02-CR-W-ODS, 2006 WL 1128802, at *2 (W.D. Mo. Apr. 27, 2006) ("In the Eighth Circuit, the current rule of law is that whether joinder is proper must be determined from the face of the indictment." (citation omitted)).

Regardless, after looking to the face of the indictment, the undersigned finds that joinder was proper under Rule 8(a).

The Eighth Circuit has found counts of a "same or similar character" when they "refer to the same type of offenses occurring over a relatively short period of time." Garrett, 648 F.3d at 625 (quoting United States v. Robaina, 39 F.3d 858, 861 (8th Cir. 1994) (internal quotation marks omitted)). Count I alleges that defendant knowingly caused a fraudulent

wire communication to be transmitted between PA and Advantage Partners concerning a bill for development work performed on TLPA's building at 4028 Florissant Avenue. Counts II and III can be characterized as engaging in fraudulent activity against PA during the periods of 2009 to 2010 and 2010 to 2011. Counts IV through VIII allege, in effect, that defendant engaged in fraudulent activity against the St. Louis City Treasurer's Office in 2006, 2007, 2008, 2009, and 2010. In a very general way, all of the counts in the indictment are of a similar character (obtaining money by fraudulent activity) and the allegations in the indictment temporally overlap. Applying Rule 8(a) liberally, joinder of all counts in one indictment was proper.

Misjoinder is but one factor to assess in determining whether severance should be ordered. See Fed. R. Crim. P. 14(a); Zafiro v. United States, 506 U.S. 534, 539 (1993); United States v. Boyd, 180 F.3d 967, 982-83 (8th Cir. 1999). Joint trials are favored because they "conserve state funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of crime to trial." United States v. Lane, 474 U.S. 438, 449 (1986) (quoting Bruton v. United States, 391 U.S. 123, 134 (1968)). The court must look to the defendant's showing that prejudice would result from joinder and consider whether such prejudice can be avoided at trial. See United States v. Pherigo, 327 F.3d 690, 693 (8th Cir. 2003) ("To grant a motion for severance, the necessary prejudice must be 'severe or compelling.' " (quoting United States v. Warfield, 97 F.3d 1014, 1018 (8th Cir. 1996))). Relevant factors, such as the effect of limiting instructions, the strength of the government's evidence, and the receipt of evidence not relevant to all counts, often cannot be fully evaluated until trial. United States v. Ghant, 339 F.3d 660, 665-66 (8th Cir. 2003); United States v. Southwest Bus Sales, Inc., 20 F.3d 1449, 1454 n.11 (8th Cir. 1994).

Defendant Robinson argues that evidence of fraud against PA, relevant to Counts I-III, would not be admissible on the remaining counts of fraud against the City. Defendant argues that even a limiting instruction by the court will be ineffective in preventing the jury from

considering irrelevant evidence on the respective counts, and that this prejudice outweighs the value of any efficiency from a joint trial.

While defendant's prejudice argument is strong, the undersigned cannot say at this time whether the factors that will appear at trial (limiting instructions and admonitions to the jury, the amount of evidence that needs to be compartmentalized, and the strength of the government's evidence) will or will not be such to reasonably expect the jury to compartmentalize the evidence.

For these reasons, the motions to sever Counts I-III from Counts IV-VIII (Docs. 26, 78) should be denied without prejudice, to be reasserted at trial upon a sufficient showing of prejudice under Rule 14.


### III.  MOTION FOR CHANGE OF VENUE

Defendant Robinson moves for change of venue, arguing that news stories have created a prejudice against him in the St. Louis metropolitan area such that he will be unlikely to receive a fair trial in this district. (Doc. 68.)

Under Federal Rule of Criminal Procedure 21(a),[13] the court must, upon motion by the defendant, transfer an action to another district if there is so great a prejudice against the defendant within the transferring district that the defendant cannot obtain a fair and impartial trial there.  Fed. R. Crim. P. 21(a); see United States v. Green, 983 F.2d 100, 102 (8th Cir. 1992) ("It is a fundamental tenet of due process is that a defendant is entitled to have his guilt determined by a fair and impartial jury.").

The Eighth Circuit has identified a two-tiered analysis as to whether transfer is required by Rule 21(a).  United States v. Nelson, 347

---

[13]Federal Rule of Criminal Procedure 21(a) states:

(a) For Prejudice.  Upon the defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there.

Fed. R. Crim. P. 21(a).

F.3d 701, 707-08 (8th Cir. 2003).  First, the court must determine "whether the pretrial publicity [is] so extensive and corrupting that [the court] must presume unfairness of constitutional magnitude exist[s]." Id. at 707 (internal quotations omitted).  This presumption "is reserved for rare and extreme cases," and the defendant "must satisfy a high threshold of proof in order to prove inherent prejudice." Id. at 707-08 (quotations omitted).  Second, if the presumption of unfairness is inapplicable, the court must "look at the voir dire testimony of those who [become] trial jurors to determine if they demonstrate[] . . . actual prejudice . . . ." Id. at 708.

In this case, the pretrial publicity has not been so extensive and corrupting as to warrant the presumption of prejudice.  While several news articles have reported on the prosecution of defendant Robinson, the media coverage has not been "extensive." See United States v. Gamboa, 439 F.3d 796, 815 (8th Cir. 2006) (holding that "[s]everal television news reports and newspaper articles mentioned the upcoming trial and [the defendant]'s involvement" was not "extensive" coverage).  The news articles submitted by defendant for court review were objective and generally not emotionally opinionated. United States v. Allee, 299 F.3d 996, 1000 (8th Cir. 2002).  This is not one of the "rare and extreme" cases in which inherent prejudice from pretrial publicity should be presumed. Nelson, 347 F.3d at 707.

Regarding the second tier of the prejudice analysis, which examines voir dire testimony to determine whether actual prejudice exists, this inquiry is premature, as voir dire has not yet occurred.  When this case reaches voir dire, the court should consider defendant's concerns regarding actual prejudice due to pretrial publicity. E.g., Green, 983 F.2d at 102 ("[I]t is preferable for the trial court to await voir dire before ruling on motions for a change of venue."); United States v. Garrett, No. 4:08 CR 703 ERW, 2009 WL 1688181, at *6 (E.D. Mo. June 17, 2009) (waiting until voir dire to consider actual prejudice argument).

Therefore, the motion for change of venue (Doc. 68) should be denied without prejudice, to be renewed upon a sufficient showing of actual prejudice following voir dire.

## IV. MOTIONS TO SUPPRESS

Defendant Robinson has moved to suppress the evidence the government acquired through the attachment of a Global Position Satellite (GPS) tracker device to his motor vehicle without judicial authorization. (Docs. 27, 67.)

From the evidence adduced during the hearings, the undersigned makes the following findings of fact and conclusions of law:

### FACTS

### Initial Investigation

1.   On October 29, 2009, Federal Bureau of Investigation (FBI) Special Agent Monique Comeau[14] interviewed a former St. Louis City Treasurer's Office (Treasurer's Office) employee, Curtis Royceton. Royceton had worked for the Treasurer's Office for 13 years as a Human Resources Personnel Analyst, which gave him knowledge of the Treasurer's Office's employee payroll information and work hours.  His employment with the Treasurer's Office was terminated when his department, the Parking Meter Maintenance Department, was privatized in 2009.

2.   Royston told Agent Comeau that, while working for the Treasurer's Office, Royceton learned that a "ghost" employee with the last name of "Robinson" was on the Treasurer's Office's payroll. According to Royceton, this employee collected a paycheck from the Treasurer's Office for performing work despite not actually performing any work for the Treasurer's Office.[15]  This employee was also a friend of the St. Louis City Treasurer, Larry Williams, and was involved in a charter school venture known as the Paideia Academy (PA) with Williams.

3.   Royceton also told Agent Comeau that every few weeks, for several hours at a time, Williams took him to an office located on

---

[14]Agent Comeau has been a Special Agent with the FBI for approximately 17 years.

[15]To Agent Comeau, a "ghost" employee was one who collects a paycheck for work performed despite not actually performing the work.

Lindell Avenue (Lindell Office)[16] to perform computer work for PA.[17]  This occurred during regular business hours, while Royceton was supposed to be performing work for the Treasurer's Office.  During these times, Williams remained with Royceton at the Lindell Office while Royceton performed the computer work for PA.

4.     Royceton also told Agent Comeau that other Treasurer's Office employees knew of the "ghost" employee but did not discuss the matter. Royceton believed that the "ghost" employee named "Robinson" had been on the Treasurer's Office's payroll for years, although Royceton did not know at what salary.

5.     After meeting with Royceton, Agent Comeau verified, through employment records with the State of Missouri, that defendant Fred W. Robinson was an employee of the City of St. Louis.  Agent Comeau also visited PA's website, which listed defendant Robinson as the Chairman of the PA Board of Trustees and Williams as a member of the PA Board of Trustees.

6.     In late November or early December 2009, Agent Comeau contacted Assistant United States Attorney (AUSA) Hal Goldsmith, who informed her that certain individuals had contacted the United States Attorney's Office regarding the St. Louis City Treasurer's Office.  AUSA Goldsmith provided Agent Comeau with the names of Ben Philips, Dan Parsons, and Harold Miner, two of whom AUSA Goldsmith had already interviewed.[18]

7.     On Tuesday, December 8, 2009, Agent Comeau conducted surveillance of defendant Robinson's residence, located at 8726 Partridge Avenue.  Agent Comeau sought to determine whether defendant was receiving a paycheck from the Treasurer's Office despite not actually performing any work for the Treasurer's Office.  At 6:50 a.m., Agent Comeau observed

---

[16]Royceton told Agent Comeau that the Lindell Office was located in the same building that housed the <u>St. Louis American</u> newspaper, which Agent Comeau believed was at 4242 Lindell Avenue.

[17]Royceton has a background in computers.

[18]The record is unclear as to which two individuals AUSA Goldsmith had already interviewed.

a red Saturn automobile pull onto Partridge Avenue and park. A woman left the vehicle and went into the residence at 8726 Partridge Avenue. A record check of the Saturn's license plate revealed that the vehicle was registered to Audrey Robinson.

8. At 9:00 a.m., Agent Comeau saw defendant Robinson leave his residence and enter a blue Chevrolet Cavalier automobile, license plate number "SE1J8M." A record check of this plate indicated that this vehicle was registered to defendant. Defendant drove to the Goody Goody Diner, parked, and entered the diner. At 10:06 a.m., he left the diner and went to PA. He parked on 20th Street, got out of the Cavalier, and entered the PA administration building. He remained in the building up to 11:10 a.m., when Agent Comeau left.

9. On Wednesday, December 9, 2009, at 11:00 a.m., Agent Comeau performed "spot surveillance," during which she observed defendant's Cavalier parked on 20th Street in front of the PA administrative building, in the same location as the day before. After fifteen or twenty minutes, Agent Comeau left. At 2:45 p.m., Agent Comeau returned to the PA administration building, where she observed defendant's Cavalier still parked. Agent Comeau left fifteen minutes later, with defendant's Cavalier still parked on 20th Street in front of the PA administrative building.

10. On Thursday, December 10, 2009, Agent Comeau spoke again with Royceton. Royceton told Agent Comeau that payroll records indicated that defendant worked both day and night shifts, which made Royceton suspicious because he was not aware of any Treasurer's Office employees working at night. Royceton never saw defendant perform any work at the Treasurer's Office, and saw him only when he came in to pick up his paycheck. Royceton learned defendant's name when Williams introduced defendant to him while he was performing computer work for PA at the Lindell Office. Defendant was usually present when Royceton performed computer work for PA at the Lindell Office. During these times, which were during regular business hours, defendant was working on PA-related matters.

11. On December 14, 2009, Agent Comeau interviewed another former Treasurer's Office employee, Dan Parsons. Parsons had been an auditor

for the Treasurer's Office for 21 years.  After the privatization of the Parking Department in 2009, Parsons retired with a disability.

12.    Parsons told Agent Comeau that he was "very familiar" with the Treasurer's Office's employees, including the employees of the Parking Enforcement Division.    According to Parsons, the State of Missouri audited the Treasurer's Office in the early 1990s and questioned the Treasurer's Office's payroll, which made him suspicious of "ghost" employees being on the Treasurer's Office's payroll.[19]  In light of the state audit, a new procedure was introduced requiring employees to sign for their paychecks.  Agent Comeau showed Parsons a copy of defendant's driver's license photograph, but Parsons could not identify defendant. When asked, Parsons stated that he was not familiar with the name "Fred Robinson."

13.    Parsons also told Agent Comeau that the Treasurer's Office was not a department of the City of St. Louis, and that revenue from parking meters, parking garages, and parking enforcement paid the salaries of the City Treasurer and the Treasurer's Office employees.

14.    On December 17, 2009, Agent Comeau interviewed another former Treasurer's Office employee, Ben Philips.  Philips had been an employee of the City of St. Louis for 28 years, during 10 of which he worked for the Treasurer's Office.  As the former Deputy Director of Administration, Philips was familiar with the Treasurer's Office's payroll, Williams, and defendant.  Philips knew that Williams and defendant were involved with PA and that defendant was part of an "external security squad" over parking meters and was supposed to work at night.  Philips had not known defendant to work and was surprised that Williams approved overtime for defendant.    Philips suspected that defendant "kicked back" money to Williams because defendant was being paid for work he was not performing.

---

[19]Parsons told Agent Comeau that he noticed that several individuals picked up paychecks, although he was unaware of any work these individuals performed.

15. Philips also told Agent Comeau that Roy White, the supervisor of the Treasurer Office's "external security" division, had worked for the Treasurer's Office for 20 years and supervised defendant.[20]

16. Philips also told Agent Comeau that he believed that two other named Treasurer's Office employees "did not perform a lot of work." Philips said that he stated his concerns to Assistant Treasurer Jackie Adams, but not to Williams.

17. On January 7, 2010, Agent Comeau interviewed another former Treasurer's Office employee, Harold Miner. Miner had been an employee of the Treasurer's Office for 35 years. He worked his way from administrative roles to becoming the Director of Fleet Operations and Maintenance; then he became the Deputy Director of Operations; and finally he became the Supervisor of the Parking Meter Revenue Collection, Maintenance, and Parking Enforcement department. He stopped working for the Treasurer's Office in 2009. Miner said that he was familiar with an "external security" department of the Treasurer's Office and believed that Williams used the department as a way to pay certain individuals a salary without them working and without being detected. Miner said that Williams protected these individuals by having them turn in their paperwork directly to Williams. Through his position Miner had access to payroll records and saw other individuals, besides defendant, on the payroll who he believed were "ghost" employees.

18. Miner told Agent Comeau that he believed that defendant did not perform any work and that he was not aware of any documentary work product that defendant turned in other than his time sheets. Miner also said that defendant never drove a City vehicle and went to the Treasurer's Office only to pick up his paychecks.

19. Miner told Agent Comeau that in his position at the Treasurer's Office, Miner learned of any parking meter-related or parking enforcement-related issues that arose on the streets and took part in resolving any such issues. Miner occasionally saw defendant in

---

[20]Agent Comeau did not interview Roy White prior to affixing the GPS to defendant's Cavalier on January 22, 2010, because the investigation was covert; Agent Comeau was concerned that news of the investigation would reach the Treasurer's Office, including Williams.

Williams's office but never saw defendant working, either during the day or at night. Miner also said that several years ago, defendant's daughter and defendant's girlfriend worked at the Treasurer's Office. Miner added that another named individual had been a "ghost" employee of the Treasurer's Office's "external security" team for 8 or 9 years, but was now deceased. Miner did not bring any of his concerns to Williams because he did not want to create problems, but he did voice his concerns to Assistant Treasurer Jackie Adams.

20. Miner also told Agent Comeau that at least two other Treasurer's Office employees, whose last names he provided to Agent Comeau, "performed little or no work." Miner named another individual who was hired by the Treasurer's Office as an engineer, even though the Treasurer's Office did not need a full-time engineer, and that the named Assistant Treasurer "did not do a lot of work."[21]

21. Miner also told Agent Comeau that Williams and the Assistant Treasurer had a real estate business with an office located at 4200 Lindell Avenue, in the City of St. Louis. Agent Comeau believed that this was the same office as the Lindell Office described by Royceton, though she did not verify this.

22. From her interviews with Royceton, Parsons, Philip, and Miner, Agent Comeau believed that the Treasurer's Office "external security" division members' primary job duty was to check whether citizens or City employees were breaking into parking meters.[22]

23. Prior to interviewing Parsons, Philip, and Miner, Agent Comeau learned that these individuals had filed a lawsuit against the Treasurer's Office arising out of their terminations from the Treasurer's Office. During her investigation, Agent Comeau did not ask Parsons, Philip, or Miner about the details of their lawsuit.

---

[21]Agent Comeau did not investigate these individuals for possible criminal conduct, because although they may have been unproductive, they were physically present at work.

[22]Because she did not want Williams to know of her investigation, Agent Comeau did not ask Williams about the job duties of the "external security" division.

24.    Throughout the investigation, Agent Comeau maintained frequent contact with AUSA Goldsmith.  On January 14, 2010, Agent Comeau met with AUSA Goldsmith to discuss the possibility of attaching a GPS tracker device to defendant's Cavalier.  Agent Comeau believed that a GPS tracker device would aid the investigation into how defendant was spending his time.[23]  From her discussions with AUSA Goldsmith, Agent Comeau did not believe that a warrant was necessary prior to affixing a GPS tracker device to defendant's Cavalier.  The decision to affix the GPS tracker device, without judicial authorization, was collectively made by Agent Comeau, AUSA Goldsmith, FBI Special Agent Tim Feeney, FBI Chief Division Counsel Craig Sieverson, and the then-Assistant FBI Special Agent in Charge.

<u>Additional Surveillance</u>

25.    During the week of Monday, January 11, to Friday, January 15, 2010, Agent Comeau went to PA two or three times to confirm that defendant was still driving the Cavalier, not the Saturn, and to corroborate that defendant was doing PA work instead of Treasurer's Office work.  During these times, Agent Comeau observed defendant's Cavalier parked in front of the PA administration building on 20th Street.

26.    Agent Comeau also went to defendant's residence on Partridge Avenue.  The residence did not have a driveway, but there was a detached garage located behind the house.  Agent Comeau drove through the alleyway behind the residence to examine the detached garage in order to determine whether defendant ever parked his Cavalier in the detached garage.  Agent Comeau saw that leaves and branches were growing against the garage door, from which she deduced that a car had not been parked in the garage recently.

27.    From midnight to 4:00 a.m. on Tuesday, January 19, Wednesday, January 20, and Thursday, January 21, 2010, Agent Comeau, FBI Special

---

[23]Agent Comeau believed that five or six agents would be necessary for an entire day of physical surveillance of defendant.

Agent Christina Kenny,[24] and FBI Special Agent Hannah Meyer conducted surveillance of defendant's residence. Each night, Agent Comeau observed defendant's Cavalier parked on the street. Agent Comeau did not observe defendant leave his residence during any of these times, nor did she see defendant with Williams.

## Suspicion of Criminal Activity

28. Based on the information gathered during the investigation, Agent Comeau suspected that defendant Robinson was a "ghost" employee of the Treasurer's Office, because he spent his time performing PA work instead of Treasurer's Office work despite being on the Treasurer's Office's payroll. On this basis, Agent Comeau believed that defendant may have violated and was violating 18 U.S.C. § 666 by defrauding the City of St. Louis.

29. Agent Comeau found no evidence that defendant was giving "kickbacks" or money to Williams. Agent Comeau did not look at defendant's Treasurer's Office time sheets prior to attaching the GPS tracker device to defendant's Cavalier. Agent Comeau was unaware of whether defendant was on vacation or taking sick days during the surveillance, and did not know the exact hours that defendant was supposed to be performing work for the Treasurer's Office.

30. Agent Comeau believed that her investigation corroborated the allegations against defendant. Although Royceton, Parsons, and Philips worked during the day and Miner worked evenings and weekends as-needed, Agent Comeau believed their allegations were credible based on her observations during her surveillance, because defendant was not turning in work product, and because defendant did not drive a City-owned vehicle.

31. Agent Comeau did not believe that defendant was going to flee or that defendant posed a physical danger to others.

---

[24]On one of these nights, Agent Kenny arrived at 1:00 a.m. instead of midnight.

32.   During the early morning hours of January 22, 2010, to facilitate the physical surveillance of defendant's movements during the day, without first obtaining a court order the agents surreptitiously affixed a GPS tracker device to the exterior of defendant's Cavalier. The device was rectangular in shape, three-to-four inches wide, seven-to-eight inches long, and two-to-three inches thick.  It was powered by its own battery; no external power from the Cavalier was necessary to operate it.   The device used a built-in antenna[25] to receive and to transmit electronic data.   A magnetic component of the device allowed it to be affixed to a metal portion of the Cavalier without the use of screws or another mechanical device that would have required drilling into the body of the vehicle.  The purpose of the tracker was to observe and record the movements and locations, in realtime, of defendant's Cavalier.

33.   The GPS tracker device was affixed to the undercarriage of the Cavalier when the vehicle was parked on the public street near defendant's residence.

34.   The GPS tracker device generally received and transmitted data 24 hours of each day from January 22 to March 17, 2010, when it ceased operating.  But, without the agents intending this, on several occasions during this period of time, the device ceased operating on its own accord and then returned to operating on its own, without the efforts of the investigating agents.

35.   During the time the GPS tracker device was affixed to the Cavalier, the investigators also conducted physical personal surveillance of the Cavalier.   At no time did the investigating agents have information from any source that the Cavalier had been driven into any garage, including the detached garage located behind defendant's residence, or onto any driveway.  At no time while it was affixed to the Cavalier was the GPS tracker device serviced by a technician.

---

[25]To operate properly, the antenna had to "see the sky."  It would not operate properly if it was inside a roofed enclosure.  The antenna could not receive or record conversations within the interior of the Cavalier.  The GPS device could not identify the driver of the Cavalier and did not affect the operation of the Cavalier in any way.

36. At all times, the Cavalier, with the GPS tracker device attached, was operated on public streets, observable by passers-by.

37. When parked near the PA administration building, the Cavalier was always parked on the public street in front of the PA administration building. The Cavalier was seen parked also outside the location on West Florissant Avenue which was being developed as The Little People's Academy (TLPA). The investigating agents never saw the Cavalier being driven by anyone else, including defendant's wife; she was observed driving a different vehicle.

38. On March 23, 2010, the GPS tracker device was removed surreptitiously from the Cavalier, while the vehicle was parked on the public street outside defendant's residence. Nothing invasive was done to the Cavalier to remove the GPS tracker device.

39. During their investigation, the agents observed, and the GPS tracker device indicated, defendant's daily pattern of activity.

40. The agents delayed applying for grand jury subpoenas for defendant's City employment time sheets until after the GPS tracker device was removed from the Cavalier.

## DISCUSSION

Defendant Robinson argues that the evidence obtained by the government from the warrantless operation of the GPS tracker device should be suppressed, because the installation and use of the device violated his First and Fourth Amendment rights.[26]

Issues raised in defendant Robinson's motions to suppress were recently addressed by the Supreme Court in United States v. Jones, 132 S. Ct. 945 (2012). In Jones, the Supreme Court addressed the question

---

[26]The government moved for leave to present additional evidence regarding reasonable suspicion following the Supreme Court's decision in Jones. (Doc. 61.) Because the Supreme Court's decision in Jones was not issued until after the government's initial briefing, the court allowed the government to present additional evidence and arguments against suppression at this stage of the proceedings. See, e.g., United States v. Castellanos, 608 F.3d 1010, 1019-20 (8th Cir. 2010) (holding that there was no waiver where the government "raised [an argument] at the earliest practicable time").

of whether the installation of a GPS tracking device onto a suspect's vehicle, coupled with the subsequent use of the device to monitor the vehicle's movements, constitutes a "search" under the Fourth Amendment. 132 S. Ct. at 949. The Court unanimously answered this question in the affirmative. Id. at 949, 954, 964.

Justice Scalia, writing for Chief Justice Roberts, Justice Kennedy, Justice Thomas, and Justice Sotomayor, stated that "the Katz[27] reasonable-expectation-of-privacy test has been *added to*, not *substituted for*, the common-law trespassory test." Id. at 952. According to the majority, the installation and use of the GPS tracking device was a "search," because the government had committed a common-law trespass for the purpose of obtaining information, conduct which "would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted." Id. at 949-51 (explaining that at a minimum, the Fourth Amendment protects "that degree of privacy against government that existed when the Fourth Amendment was adopted" (citation omitted)). The majority declined to address whether the installation and use of a GPS tracking device would have been a Fourth Amendment "search" absent the common-law trespass. Id. at 953-54.

Justice Sotomayor wrote a concurring opinion agreeing that the "common-law trespassory test" augmented the "reasonable expectation of privacy" test, but also stated that long-term GPS monitoring impinges on expectations of privacy. Id. at 954-55 (Sotomayor, J., concurring). Justice Sotomayor also discussed the attributes of GPS monitoring and considered whether an individual has a reasonable expectation of privacy in the sum of his or her movements and whether society recognizes this expectation as reasonable. Id. at 955-57.

Justice Alito, joined by Justice Ginsburg, Justice Breyer, and Justice Kagan, filed a concurring opinion disagreeing with the conclusion that the "common-law trespassory theory" survived Katz but agreeing that a Fourth Amendment "search" had occurred, reasoning that "the use of

---

[27]Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J., concurring).

longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy." Id. at 957-64 (Alito, J., concurring).

## A. Fourth Amendment

The Fourth Amendment to the Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. To secure these rights, the Fourth Amendment provides "no Warrants shall issue, but upon probable cause, supported by Oath of affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Id. The goal of the Fourth Amendment is to ensure that a search will be carefully tailored to its justifications, and will not become a wide-ranging exploratory search. Maryland v. Garrison, 480 U.S. 79, 84 (1987).

"[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967) (footnotes omitted). When the government seeks to introduce evidence seized during a warrantless search, it bears the burden of demonstrating the applicability of an exception to the warrant requirement. United States v. Kennedy, 427 F.3d 1136, 1144 (8th Cir. 2005).

### 1. Reliance on Binding Precedent

The government first argues that the evidence obtained from the GPS tracker device should not be suppressed because the agents reasonably relied on binding precedent in believing that judicial authorization was not required prior to installing and using the GPS tracker device.

"The ordinary sanction for police violation of Fourth Amendment limitations has long been suppression of the evidentiary fruits of the transgression." United States v. Fiorito, 640 F.3d 338, 345 (8th Cir. 2011). Suppression of evidence, however, "is not an automatic consequence of a Fourth Amendment violation." Herring v. United States, 555 U.S. 135, 137 (2009). The judicially-created exclusionary rule is "a deterrent sanction that bars the prosecution from introducing evidence

obtained by way of a Fourth Amendment violation." <u>Davis v. United States</u>, 131 S. Ct. 2419, 2423 (2011); <u>accord</u> <u>Stone v. Powell</u>, 428 U.S. 465, 486 (1976) ("The primary justification for the exclusionary rule . . . is the deterrence of police conduct that violates Fourth Amendment rights."). Thus, "[w]here suppression fails to yield 'appreciable deterrence,' exclusion is 'clearly unwarranted.' " <u>Davis</u>, 131 S. Ct. at 2426-27 (quotation omitted).

Appreciable deterrence, while necessary, is not itself sufficient to warrant suppression; the need for exclusion also must outweigh the "substantial societal costs" that derive from "ignor[ing] reliable, trustworthy evidence bearing on guilt or innocence." <u>Id.</u> at 2427. The need for suppression is tied to "the culpability of the law enforcement conduct" in that:

> When the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs. But where the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way.

<u>Id.</u> at 2427-28 (internal citations and quotations omitted); <u>see also</u> <u>United States v. Leon</u>, 468 U.S. 897, 909 (1984) (articulating the "reasonable good-faith belief" exception to the exclusionary rule). Recently, in <u>Davis v. United States</u>, the Supreme Court extended this rationale, stating that "when the police conduct a search in objectively reasonable reliance on binding appellate precedent" that is later overruled, "the exclusionary rule does not apply." 131 S. Ct. at 2434.

To determine whether officers objectively and reasonably relied on binding precedent in conducting a search, courts evaluate whether the officers "acted in strict compliance with then-binding Circuit law." <u>Id.</u> at 2428; <u>see also</u> <u>United States v. Amaya</u>, ___ F. Supp. 2d ___, No. CR 11-4065-MWB, 2012 WL 1188456, at *7 (N.D. Iowa Apr. 10, 2012) ("Lower courts, accordingly, when applying <u>Davis</u>, have looked to officers' compliance with, not knowledge of, binding appellate precedent."), <u>withdrawn in part on other grounds</u>, ___ F. Supp. 2d ___, No. CR 11-4065-MWB, 2012 WL 1523045 (N.D. Iowa May 1, 2012).

The government first identifies two Supreme Court opinions, United States v. Knotts[28] and United States v. Karo,[29] in support of its good-faith argument. In Jones, the Court stated that Knotts and Karo do not support the proposition that the warrantless, trespassory installation of a GPS tracker device on a suspect's vehicle for the purpose of monitoring the vehicle's movements is not a Fourth Amendment "search." Jones, 132 S. Ct. at 951-52 (reasoning that in both Knotts and Karo, the electronic beepers were installed in containers with the consent of the containers' original owners prior to coming into the suspects' possession). Both Knotts and Karo remain good law post-Jones; neither was overruled by Jones. Id.

While neither Knotts nor Karo precisely authorized the warrantless, trespassory installation and use of a GPS tracker device, the agents' belief that their actions were permitted under these holdings was reasonable. This reasonableness is supported by the then-existing judicial opinions from other circuits and, later, by a ruling of the Eighth Circuit. See United States v. Leon, ___ F. Supp. 2d ___, No. CR 09-00452 JMS, 2012 WL 1081962, at *4-6 (D. Hawaii Mar. 28, 2012) (holding that based on Knotts, other circuits' holdings, and the Ninth Circuit's subsequent holding, agents acted with an objectively reasonable good-faith belief that they did not need a warrant prior to installing a GPS tracking device on a suspect's vehicle and using the device to monitor the vehicle's movements).

In Knotts, the Court held that the law enforcement officers' use of an electronic beeper, which was hidden inside a chemical container with the original owner's consent prior to coming into the defendant's possession, to track the defendant's movements as he traveled on public roads with the container in his vehicle did not violate the Fourth Amendment:

> A person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another. When [one of the defendant's co-conspirators] travelled over the public streets he voluntarily

[28]460 U.S. 276 (1983).

[29]468 U.S. 705 (1984).

> conveyed to anyone who wanted to look the fact that he was
> travelling over particular roads in a particular direction,
> the fact of whatever stops he made, and the fact of his final
> destination when he exited from public roads onto public
> property.

460 U.S. at 281-82. In <u>Karo</u>, the Court held that the consensual installation of an electronic beeper in a can prior to coming into the defendant's possession was not a search because the beeper, while "creat[ing] the potential for an invasion of privacy," actually "conveyed no information that [the defendant] wished to keep private, for it conveyed no information at all." 468 U.S. at 712.

Prior to the agents' installation and use of the GPS tracker device on defendant's Cavalier, those circuits that had occasion to address the issue held, relying on <u>Knotts</u>, that no warrant was needed. <u>See</u> <u>United States v. Pineda-Moreno</u>, 591 F.3d 1212, 1216-17 (9th Cir. 2010)[30] ("[T]he police did not conduct an impermissible search of [the defendant]'s car by monitoring its location with mobile tracking devices."), <u>vacated and remanded</u>, 132 S. Ct. 1533 (2012); <u>United States v. Garcia</u>, 474 F.3d 994, 997 (7th Cir. 2007) ("But GPS tracking is on the same side of the divide with the surveillance cameras and the satellite imaging, and if what they do is not searching in Fourth Amendment terms, neither is GPS tracking."), <u>cert. denied</u>, 552 U.S. 883 (2007). The only contrary federal court of appeals opinion, the District of Columbia Circuit's decision in <u>United States v. Maynard</u>,[31] was not decided until almost five months after the agents removed the GPS tracker device from defendant's vehicle.

"And although not directly relevant to the agents' objectively reasonable good-faith belief" at the time of the installation and use, <u>Leon</u>, 2012 WL 1081962, at *5, four months after the agents installed the GPS tracker device, three judges of the Eighth Circuit Court of Appeals held that "when police have reasonable suspicion that a particular vehicle is [involved in criminal activity], a warrant is not required

---

[30]<u>Pineda-Moreno</u> was decided on January 11, 2010—prior to the agents' installation of the GPS tracker device on January 22, 2010.

[31]615 F.3d 544 (D.C. Cir. 2010), <u>aff'd sub nom.</u> <u>United States v. Jones</u>, 132 S. Ct. 945 (2012).

when, while the vehicle is parked in a public place, they install a non-invasive GPS tracking device on it for a reasonable period of time." United States v. Marquez, 605 F.3d 604, 610 (8th Cir. 2010). In so holding, the Eighth Circuit relied, in part, on Knotts and Karo. Id. at 609-10. See Leon, 2012 WL 1081962, at *5 ("[A] court would be hard-pressed to place culpability on the agents for their actions in 2009 when, one year later, three judges of the Ninth Circuit relied on Knotts to conclude that the prolonged use of a GPS tracking device did not violate the Fourth Amendment.").

In light of the Supreme Court's opinions in Knotts and Karo, as interpreted and applied by the Ninth Circuit in Pineda-Moreno, the Seventh Circuit in Garcia, and subsequently by the Eighth Circuit in Marquez, the undersigned concludes that the agents acted in objective, reasonable reliance on binding precedent when they installed and used the GPS tracker device. As such, the evidence obtained by using the GPS tracker device should not be suppressed. See Davis, 131 S. Ct. at 2429 (noting that "in 27 years of practice under Leon's good-faith exception, [the Supreme Court has] never applied the exclusionary rule to suppress evidence obtained as a result of nonculpable, innocent police conduct" (citation omitted)).

In this case, the relevant binding precedent was not factually identical and was ultimately distinguished by the Court in Jones. But the agents' ultimately erroneous interpretation of Supreme Court precedent was no more culpable than if they had relied on factually identical Supreme Court precedent that was later overturned. See id. at 2439 (Breyer, J., dissenting) (noting that an officer is not "more culpable where circuit precedent is simply suggestive rather than 'binding,' where it only describes how to treat roughly analogous instances, or where it just does not exist"). As evidenced by the Seventh, Eighth, and Ninth Circuits' holdings, the agents' interpretation of binding precedent was reasonable; the agents did not exploit an unanswered or disputed question of law. Cf. United States v. Johnson, 457 U.S. 537, 561 (1982) ("Official awareness of the dubious constitutionality of a practice would be counterbalanced by official certainty that, so long as the Fourth Amendment law in the area remained

unsettled, evidence obtained through the questionable practice would be excluded only in the one case definitively resolving the unsettled question."). <u>See also</u> <u>Davis</u>, 131 S. Ct. at 2435 (Sotomayor, J., concurring) (recognizing that although the court of appeals required the "precedent on a given point [to be] unequivocal," the majority in <u>Davis</u> left this issue unresolved).

Therefore, the evidence obtained from the warrantless, trespassory installation and use of the GPS tracker device should not be suppressed, because the officers objectively and reasonably relied on binding precedent in believing that they did not need a warrant prior to installing the GPS tracker device onto defendant's vehicle and using the device to monitor the vehicle's movements.

## 2. Reasonable Suspicion

The government also argues that although installation and use of the GPS tracker device was a Fourth Amendment "search," it was not an "unreasonable search" for which the Fourth Amendment requires a warrant.

In <u>Jones</u>, the Court did not reach the issue of whether a warrant is required for law enforcement agents to install a GPS tracking device on a suspect's vehicle and to use the device to monitor the vehicle's movements:

> The Government argues in the alternative that even if the attachment and use of the device was a search, it was reasonable—and thus lawful—under the Fourth Amendment because "officers had reasonable suspicion, and indeed probable cause, to believe that [the defendant] was a leader in a large-scale cocaine distribution conspiracy." We have no occasion to consider this argument. The Government did not raise it below, and the D.C. Circuit therefore did not address it. We consider the argument forfeited.

132 S. Ct. at 954 (internal citations omitted).

"[T]he Fourth Amendment bars only unreasonable searches and seizures." <u>Maryland v. Buie</u>, 494 U.S. 325, 331 (1990); <u>accord</u> <u>United States v. Sharpe</u>, 470 U.S. 675, 682 (1985) ("The Fourth Amendment is not, of course, a guarantee against <em>all</em> searches and seizures, but only against <em>unreasonable</em> searches and seizures."); <u>Vale v. Louisiana</u>, 399 U.S. 30, 36 (1970) (Black, J., dissenting) ("A warrant has never been

thought to be an absolute requirement for a constitutionally proper search."). Whether a search is "reasonable" under the totality of the circumstances "is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." <u>Samson v. California</u>, 547 U.S. 843, 848 (2006) (citation omitted); <u>see also</u> <u>Bell v. Wolfish</u>, 441 U.S. 520, 559 (1979) (explaining that when examining the reasonableness of a Fourth Amendment search, "[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted"); <u>Terry v. Ohio</u>, 392 U.S. 1, 21-31 (1968) (similar).

In <u>Marquez</u>, the Eighth Circuit determined that "when police have reasonable suspicion that a particular vehicle is [involved in criminal activity], a warrant is not required when, while the vehicle is parked in a public place, they install a non-invasive GPS tracking device on it for a reasonable period of time." 605 F.3d at 610.

The government argues that because the agents had a reasonable suspicion that defendant Robinson was engaging in criminal conduct, the agents did not need a warrant prior to installing the GPS tracker device on defendant's vehicle and using the device to track the vehicle's movements.[32]

The undersigned concludes that <u>Marquez</u> was not disturbed by the Supreme Court's holding in <u>Jones</u>; as discussed above, the <u>Jones</u> Court declined to address whether such a search would be reasonable without a warrant if the investigating agents reasonably suspected criminal activity. <u>Jones</u>, 132 S. Ct. at 954. As such, <u>Marquez</u> remains binding law in the Eighth Circuit.

Moreover, <u>Marquez</u>'s implicit conclusion, that the privacy intrusion of GPS monitoring of a suspect's vehicle is outweighed by the need for GPS monitoring to promote government interests, is supported by Supreme Court precedent. The Court has recognized that "[g]enerally, less

_____

[32]The government does not argue that the agents had probable cause to believe that defendant Robinson was engaging in criminal activity prior to installing and using the GPS tracker device.

stringent warrant requirements have been applied to vehicles," and that "[t]he search of an automobile is far less intrusive on the rights protected by the Fourth Amendment than the search of one's person or of a building." Cardwell v. Lewis, 417 U.S. 583, 589-90 (1974). The Court has explained:

> One has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects. A car has little capacity for escaping public scrutiny. It travels public thoroughfares where its occupants and its contents are in plain view. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.

Id. at 591 (citations and quotations omitted). The privacy intrusion from the installation of a GPS tracking device is, at most, minimal. See New York v. Class, 475 U.S. 106, 114 (1986) ("The exterior of a car, of course, is thrust into the public eye, and thus to examine it does not constitute a 'search.' "). Nor is the use of a GPS tracking device to monitor a vehicle's movements on public roads highly intrusive upon an individual's expectation of privacy. The device does not reveal the identity of the vehicle's occupants, nor does it reveal their conduct or conversation; the device reveals only the vehicle's location.[33] See Knotts, 460 U.S. at 281 ("A person travelling in an automobile on public

---

[33]In her concurring opinion in Jones, Justice Sotomayor expressed concern that long-term GPS monitoring reveals "a wealth of detail about [a person's] familiar, political, professional, religious, and sexual associations." 132 S. Ct. at 955 (Sotomayor, J., concurring). Justice Alito went as far as to say that society's expectation has been that law enforcement officers would not and could not "secretly monitor and catalogue every single movement of an individual's car for a very long period." Id. at 964 (Alito, J., concurring). The current state of the law, however, is that an individual has "no reasonable expectation of privacy in his movements from one place to another," Knotts, 460 U.S. at 281, and as Justice Scalia noted during oral argument in Jones, "100 times zero equals zero." Oral Argument at 40:25-41:1, United States v. Jones, 132 S. Ct. 945 (No. 10-1259) (2012) (Scalia, J.); but see Maynard, 615 F.3d at 562 (applying the "mosaic theory" to information gathered during prolonged surveillance). As Justice Sotomayor noted in her concurring opinion, holding otherwise would require the Court "to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties." Jones, 132 S. Ct. at 957 (Sotomayor, J., concurring).

thoroughfares has no reasonable expectation of privacy in his movements from one place to another."); cf. Smith v. Maryland, 442 U.S. 735, 743-45 (1979) (holding that the installation and use of a pen register at the telephone company's central office to record the numbers dialed from the telephone in the defendant's home was not a "search").

Requiring the presence of particularized reasonable suspicion also dispels concerns of mass, arbitrary GPS monitoring. See Marquez, 605 F.3d at 610 (noting that while "wholesale surveillance" by police would raise serious concerns, in that case "there was nothing random or arbitrary about the installation and use of the device"); Garcia, 474 F.3d at 998 (stating that because the police had "abundant grounds for suspecting the defendant," the constitutionality of "programs of mass surveillance of vehicular movements" was not implicated).

Thus, as long as they had reasonable suspicion that defendant's vehicle facilitated defendant's suspected criminal activity, the investigating agents lawfully installed the GPS tracker device on the vehicle and lawfully used the device to track the vehicle's movements on public roads without first obtaining a warrant.[34]

"Reasonable suspicion is a lower threshold than probable cause, and it requires considerably less than proof of wronging by a preponderance of the evidence." United States v. Carpenter, 462 F.3d 981, 986 (8th Cir. 2006) (internal citation omitted). "An officer's suspicion is reasonable if he 'knows particularized, objective facts that lead to a rational

---

[34]Defendant does not challenge Marquez's other requirements, namely, that (1) installation and removal of the GPS tracking device be non-invasive; (2) installation occur while the vehicle is on a public road or other public property; (3) the vehicle travel only on public roadways during the time the device is monitored; and (4) the device be attached and monitored only for a reasonable period of time. Marquez, 605 F.3d at 610. From the facts adduced at the hearings, the undersigned finds that the installation and the removal of the GPS tracking device from defendant's vehicle was non-invasive; installation occurred while the vehicle was on a public street; the vehicle only ever traveled on public roads while being monitored; and the device was attached for a reasonable period of time, approximately two months, as the Marquez court found the duration of approximately six months to be reasonable. See Brief of Appellee at 3-4, United States v. Marquez, 605 F.3d 604 (8th Cir. 2010), available at 2009 WL 2955451 (stating that the GPS tracker device was installed on May 2, 2007, and was removed in October of 2007).

inference that a crime is being or has been committed.' " <u>United States</u> <u>v. Gannon</u>, 531 F.3d 657, 661 (8th Cir. 2008) (quoting <u>United States v.</u> <u>Hernandez-Hernandez</u>, 327 F.3d 703, 706 (8th Cir. 2003)). Whether an officer had a particularized and objective basis for suspecting legal wrongdoing is evaluated under the totality of the circumstances. <u>United</u> <u>States v. Arvizu</u>, 534 U.S. 266, 273 (2002). Reasonable suspicion can be based on hearsay information, the tip of a sufficiently reliable informant, or an officer's assessment of a situation made from his or her specialized training. <u>United States v. Robinson</u>, 670 F.3d 874, 876 (8th Cir. 2012); <u>United States v. Huerta</u>, 655 F.3d 806, 809-10 (8th Cir. 2011). That any one factor is insufficient to establish reasonable suspicion is not dispositive; "the sum of the factors taken together can amount to reasonable suspicion." <u>Huerta</u>, 655 F.3d at 809.

In this case, the investigating agents had reasonable suspicion to believe that defendant had engaged in and was engaging in criminal activity, namely, submitting false time sheets to be paid for work not performed. Prior to installing the GPS tracking device, Agent Comeau interviewed four long-time former employees of the Treasurer's Office, Curtis Royceton, Dan Parsons, Ben Philips, and Harold Miner, each of whom provided information supporting the investigating agents' suspicion.

Royceton told Agent Comeau that there was a "ghost" employee on the Treasurer's Office's payroll whose last name was "Robinson." Royceton believed that this Robinson was a friend of City Treasurer Larry Williams; that this Robinson was involved in a charter school venture, PA, with Williams; and that this Robinson would perform work for PA during regular business hours at the Lindell Office. Agent Comeau verified through employment records with the State of Missouri that defendant was a City employee, and verified through PA's website that defendant and Williams were involved with the PA.

Parsons told Agent Comeau that a state audit made him suspicious of a "ghost" employee being on the Treasurer's Office's payroll. Despite being "very familiar" with the Treasurer's Office's employees, Parsons did not recognize defendant Robinson's name or photograph.

Ben Philips told Agent Comeau that defendant and Williams were involved with PA and that he believed that defendant worked in an

"external security" department as a way to "kick back" money to Williams, because defendant was being paid for work he was not performing.

Harold Minor told Agent Comeau that he believed that Williams used the "external security" department as a way to pay certain individuals, including defendant, a salary without them working and without being detected.  Miner also told Agent Comeau that he believed that defendant performed no work, never drove a City vehicle, and went to the Treasurer's Office only to pick up his paychecks.

Surveillance by Agent Comeau on December 8-9, 2009, and January 11-15, 2010, and by Agent Comeau, Agent Kenny, and Agent Meyer on January 19-21, 2010, corroborated their suspicion that defendant was submitting false time sheets.  During none of these times, which were all weekdays, was defendant observed at the Treasurer's Office, nor did defendant appear to be performing work for the Treasurer's Office; frequently, defendant appeared to be performing work for PA.

From this information, the undersigned concludes that the investigating agents had a reasonable suspicion that defendant Robinson had previously engaged in and was currently engaging in criminal activity.  The agents believed that tracking the movements of defendant's vehicle would enable them to confirm or dispel their suspicion.  By tracking defendant's vehicle, the agents would be able to observe defendant's daily pattern accurately and cost-effectively.

Therefore, the agents did not need to obtain a judicial warrant prior to installing the GPS tracker device on defendant's vehicle and using the device to monitor the vehicle's movements.  The evidence obtained from the GPS tracker device should not be suppressed for lack of reasonable suspicion.

### 3.  Seizure

A "seizure" of property occurs under the Fourth Amendment when "there is some meaningful interference with an individual's possessory interest in that property." Karo, 468 U.S. at 712 (quoting United States v. Jacobsen, 466 U.S. 109, 113 (1984)) (internal quotation marks omitted).  Whether there was a physical trespass is "only marginally relevant to the question of whether the Fourth Amendment has been

violated, . . . for an actual trespass is neither necessary nor sufficient to establish a constitutional violation." <u>Id.</u> at 712-13.

The installation of the GPS tracker device onto defendant's vehicle was not a Fourth Amendment seizure. Defendant's vehicle was parked on a public street when agents affixed the GPS tracker device to the vehicle. The GPS tracker device's presence did not deprive defendant of his dominion and control of the vehicle, nor did the GPS tracker device's presence interfere with the electronic components of the vehicle, draw power from the vehicle, take up room that may have otherwise been occupied by passengers or packages, or alter the vehicle's appearance. As Justice Alito stated in his concurring opinion in <u>Jones</u>, there is no Fourth Amendment seizure under these circumstances. <u>See</u> <u>Jones</u>, 132 S. Ct. at 958 (Alito, J., concurring) (noting that the majority "[did] not contend that there was a seizure" and, indeed, there was no seizure, as "the success of the surveillance technique that the officers employed was dependent on the fact that the GPS did not interfere in any way with the operation of the vehicle, for if any such interference had been detected, the device may have been discovered"). <u>See also</u> <u>Garcia</u>, 474 F.3d at 996 (holding that there was no Fourth Amendment seizure under similar circumstances because "[t]he device did not affect the car's driving qualities, did not draw power from the car's engine or battery, did not take up room that might otherwise have been occupied by passengers or packages, [and] did not even alter the car's appearance").

Therefore, defendant's motion to suppress based on a Fourth Amendment seizure should be denied.

## B. First Amendment

Defendant Robinson argues that the government's use of the GPS tracker device violated his First Amendment right to keep his associations private, citing <u>NAACP v. Alabama</u>[35] and <u>Maynard</u>. Defendant also argues that the Fourth Amendment's protection of privacy rights also protects First Amendment associational rights, citing <u>Katz</u>.

---

[35]357 U.S. 449, 462 (1958).

The courts that have addressed similar arguments have held that evidence obtained from GPS surveillance should not be suppressed on First Amendment grounds. <u>See, e.g.</u>, <u>United States v. Walker</u>, 771 F. Supp. 2d 803, 813 n.9 (W.D. Mich. 2011) (rejecting the defendant's argument that restricting "a First Amendment freedom constitutes a Fourth Amendment search or seizure"); <u>United States v. Sparks</u>, 750 F. Supp. 2d 384, 387 n.5 (D. Mass. 2010) (rejecting the defendant's argument for suppression based on a purported violation of his First Amendment right to free association because "[t]he exclusionary rule is a judicial remedy for violations of the Fourth Amendment, not the First Amendment").

Moreover, as discussed above, the agents' warrantless installation and use of the GPS tracker device did not violate defendant's Fourth Amendment rights because the agents reasonably believed that defendant was engaging in criminal activity; to the extent the exclusionary rule could apply, the good-faith exception of <u>Davis</u> would similarly apply.

Therefore, to the extent that the First Amendment could be implicated[36] and the exclusionary rule could be applicable, suppression is not warranted on First Amendment grounds.

## V. CONCLUSION

For the reasons stated above,

**IT IS HEREBY ORDERED** that the motion of the government for leave to present additional evidence relating to reasonable suspicion (Doc. 61) is sustained.

**IT IS HEREBY RECOMMENDED** that the motions of defendant Fred W. Robinson to dismiss (Docs. 25, 52, 66) be denied.

**IT IS FURTHER RECOMMENDED** that the motions of defendant to sever (Docs. 26, 78) be denied without prejudice, to be refiled upon a sufficient showing of prejudice at trial.

---

[36]<u>See</u> <u>Jones</u>, 132 S. Ct. at 956 (Sotomayor, J., concurring) ("Awareness that the Government may be watching chills associational and expressive freedoms."); <u>In re Application of the United States</u>, ___ F. Supp. 2d ___, No. 10-2188-SKG, 2011 WL 3423370, at *9 n.5 (D. Md. Aug. 3, 2011) (noting that "[s]ome courts and commentators have suggested that prolonged surveillance might also implicate the subject's First Amendment rights of freedom of association").

**IT IS FURTHER RECOMMENDED** that the motion of defendant for change of venue (Doc. 68) be denied without prejudice, to be renewed upon a sufficient showing of actual prejudice after venire panel voir dire.

**IT IS FURTHER RECOMMENDED** that the motions of defendant to suppress evidence (Docs. 27, 67) be denied.

The parties are advised that they have until close of business on June 8, 2012, to file objections to this Report and Recommendation. The failure to file timely objections may waive the right to appeal issues of fact.

_____/S/___David D. Noce_____
**UNITED STATES MAGISTRATE JUDGE**

Signed on May 24, 2012.