UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:11CR00361 AGF/DDN |
| | ) | |
| FRED W. ROBINSON, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S
OBJECTIONS TO THE MAGISTRATE'S
SECOND PRETRIAL ORDER AND RECOMMENDATION**

COMES NOW the United States of America, by and through Richard G. Callahan,

United States Attorney for the Eastern District of Missouri, and Hal Goldsmith, Assistant United

States Attorney for said District, and in response to Defendant Robinson's Objections to the

Magistrate's Second Pretrial Order and Recommendation, states to this Honorable Court as

follows:

1.      **Motion To Dismiss**.

Counts 4 - 8 of the Superseding Indictment against defendant allege violations of Title

18, U.S.C., Section 666(a)(1)(A) for each of the years 2006 - 2010.  In the Superseding

Indictment, defendant is alleged to have been "an agent of an organization, that is, the City of St.

Louis as an employee of the Treasurer's Office".  The legal elements of a 666(a)(1)(A) violation

are:

1.      Defendant was an agent of an organization, agency or governmental unit;

2.      During the period charged, the defendant embezzled, stole, or obtained by fraud

1

property of a value of $5,000 or more;

3.      The property was owned by, or under the care, custody, control of the organization, agency or governmental unit; and,

4.      The organization, agency or governmental unit received benefits in excess of $10,000 in the one-year period charged pursuant to a federal program involving a grant, contract, subsidy, loan, guarantee, insurance or other federal assistance.

Eighth Circuit Model Jury Instructions, 6.18.666A.

Defendant's current objection to the Second R & R, framed as a jurisdictional challenge, actually challenges the sufficiency of the government's evidence as to the first element, arguing that as an employee purportedly working in the City of St. Louis Treasurer's Office, he was not an agent of the City of St. Louis.  Defendant weaves into this argument a challenge to the sufficiency of the government's evidence as to the fourth element, that the City of St. Louis received in excess of $10,000 during the pertinent years, by alleging that defendant was an employee of the Treasurer's Office, not the City of St. Louis.  (Defendant's Objections, pp. 2-3). The government submits that defendant's argument here is a challenge to the sufficiency of the evidence, not the jurisdiction of the District Court.  Being an agent or employee of the receiving organization, agency, or governmental unit is an element of the offenses charged.  *See, e.g.*: *Fischer v. United States*, 529 U.S. 667, 676 (2000); *United States v. Robinson*, 663 F.3d 265, 66-67 (7th Cir. 2011).  Courts "routinely rebuff" efforts, such as this, to use a motion to dismiss to test the sufficiency of the evidence.  *See, United States v. Guerrier*, __ F.3d __, 2011WL6415042*1 (1st Cir. 2011)(collecting cases).  Defendant's employment or agency relative to the City of St. Louis, the receiving organization, government, or agency, is an element of each of the offenses charged in the pertinent counts of the superseding indictment that the government will have to prove at trial, and this Court should not consider a motion to dismiss on

2

*jurisdictional* grounds on this issue of proof at this time.

      As Magistrate Judge Noce found:

> Defendant's argument concerns the indictment's factual allegation
> that he was an employee of the City of St. Louis by virtue of his
> employment with the City Treasurer's Office.  This argument,
> however, is more properly construed as a challenge to the
> sufficiency of the government's evidence; the court has subject
> matter jurisdiction over Counts IV-VIII on the basis of the
> defendant being "charged with an 'offense against the laws of the
> United States.' " (citations omitted).

(Second R & R, p. 8).  The Magistrate Judge further determined:

> As a challenge to the sufficiency of the government's evidence,
> defendant's motion is not properly raised at this time.  "[S]o long
> as the indictment [is] facially sufficient...,federal criminal
> procedure does not 'provide for a pre-trial determination of
> sufficiency of the evidence.' " *United States v. Ferro*252 F.3d 964,
> 968 (8th Cir. 2001)(quoting *United States v. Critzer*, 951 F.2d 306,
> 307-08 (11th Cir. 1992).

(Second R & R, p. 9).  The Magistrate Judge went on to properly conclude that the superseding

indictment is "legally sufficient on its face", containing all of the essential elements of the

offenses charged, fairly informing defendant Robinson of the charges against him, and alleging

sufficient information such that a conviction or acquittal would allow defendant Robinson to

raise Double Jeopardy to challenge any subsequent prosecution.  Citing, *United States v. Sohn*,

567 F.3d 392, 394 (8th Cir. 2009).  (Second R & R, pp. 9-10).[1]

      Further, the plain language of the statute does not require, as an element to be proved

---

[1] The Magistrate Judge also appropriately found that defendant had improperly relied
upon evidence outside the four corners of the superseding indictment in arguing that the factual
allegations contained within the superseding indictment were untrue.  "At this stage of the
proceedings, however, the factual allegations in the indictment must be accepted as true".
*United States v. Sampson*, 371 U.S. 75, 78-79 (1962).

beyond a reasonable doubt, a nexus between the activity that constitutes a violation and the federal funds.  *United States v. Hines*, 541 F.3d 833, 836 (8th Cir. 2008).  *See*, *United States v. Sabri*, 541 U.S. 600 (2004).  Thus, the fact that the Superseding Indictment alleges that defendant Robinson was an agent of the City of St. Louis, and that the City of St. Louis received in excess of $10,000 in HUD grant funds[2] during the pertinent time periods is sufficient for purposes of Section 666.[3]

Should this Court disagree with the Magistrate Judge's findings and recommendations, and determine it appropriate to consider pretrial the evidence as to the issue of whether defendant Robinson was an agent of the City of St. Louis, the receiving organization, the government submits that there is substantial evidence in the record to make such a finding.

The City Counselor for the City of St. Louis advised the FBI that the federal HUD funds at issue were deposited into the City of St. Louis bank accounts.  (4-12-12 Hrg., p. 67).  The Chief Financial Officer for the St. Louis Treasurer's Office advised the FBI that Treasurer's Office employees, including defendant Robinson, submit their timesheets to the Treasurer's

---

[2] Defendant suggests that the superseding indictment alleges "that renewal grants from the Department of Housing and Urban Development [are] provided to the City of St. Louis *Department of Human Services for a Supportive Housing Program*." (Defendant's Objections, pp. 2-3).  However, the superseding indictment actually alleges that *the City of St. Louis* received federal funds "through grants from the United States Department of Housing and Urban Development."  (Superseding Indictment, counts 4-8).  There is no allegation on the face of the superseding indictment that the federal funds are provided to a specific city department, but in fact the allegation is that the funds are provided to the City of St. Louis.

[3] The government presented evidence during the April 12, 2012 Hearing that the HUD funds are deposited into the City of St. Louis bank accounts, and that defendant Robinson, along with the other Treasurer's Office employees, are paid with City of St. Louis payroll checks, from the City of St. Louis bank accounts based upon the timesheets submitted by defendant and the other employees.  (4-12-12 Hrg., pp. 67-69).

4

Office and that information is transmitted to the City of St. Louis Comptroller's Office which processes the payroll checks for all of the city employees, including defendant and the other Treasurer's Office employees.  (4-12-12 Hrg., p. 68).  City of St. Louis Payroll checks are then printed, drawn from the City of St. Louis bank accounts, and distributed to the various city departments, including the Treasurer's Office, for final distribution to the city employees, including defendant Robinson.  (4-12-12 Hrg., p. 69).

Defendant Robinson receives annual W-2 tax forms from his employer, the City of St. Louis.  (4-12-12 Hrg., p. 69; Exhibit 7).  When defendant Robinson began his employment, a New Employee Information Form for the City of St. Louis was completed, identifying the department as the Treasurer's Office.  (4-12-12 Hrg., pp. 72-73; Exhibit 2).  W-4 tax forms completed and signed by defendant Robinson identify his employer as the City of St. Louis.  (4-12-12 Hrg., pp. 73-74; Exhibit 3).  When defendant's employment status changed from time to time, City of St. Louis Employee Status Forms were completed.  (4-12-12 Hrg., pp. 73-74; Exhibit 4).  When payroll checks needed to be reissued to defendant from time to time, City of St. Louis Request For Reissued or Supplemental Paychecks forms were completed.  (4-12-12 Hrg., p. 74; Exhibit 5).  Paychecks and pay stubs for defendant Robinson were issued on a City of St. Louis bank account.  (4-12-12 Hrg., p. 74; Exhibit 6).  The Employer Identification Number on defendant's W-2 tax forms is for the City of St. Louis.

Title 18, U.S.C., Section 666(d)(1) defines the term "agent" in the case of an organization or government to include "a servant or employee".  Defendant's counsel have repeatedly stated in court and to the media that defendant is an employee of the City of St. Louis.  *See*, articles attached to Defendant's Motion For Change of Venue (doc. 68): "O.K. as you know Mr.

5

Robinson is paid by the City of St. Louis and that is his job.  OK?"  "Mr. Robinson, uhm, is employed by the City of St. Louis and performing his job.  He's employed by the City of St. Louis".  (KTVI-KPLR, February 10, 2012); "Despite a federal indictment, the city has found him worthy of a paycheck".  (St. Louis Post Dispatch, December 2, 2011) Further, one need only look at the Organizational Chart submitted by defendant as Exhibit B to his Motion to Dismiss(doc. 66) to understand that the Treasurer's Office for the City of St. Louis is an agency or department of the "Government of the City of St. Louis, Missouri", answerable to the "Citizens of St. Louis".  Defendant's suggestion that, because the Treasurer for the City of St. Louis is an elected official his office is not a department or subdivision of the City of St. Louis and, therefore, not a government agency for purposes of 18 U.S.C. 666, is without merit.  The government respectfully submits that defendant is confusing the issue in his argument by suggesting that the Treasurer's Office is not a "government agency" for purposes of Section 666. The issue instead is whether the City of St. Louis is an organization, government, or government agency.  While the Treasurer of the City of St. Louis, as an elected official, may not be directly answerable to the Mayor, he is an agent of the City of St. Louis and answerable to the citizens of St. Louis who elected him.  The Treasurer's Office for the City of St. Louis is a department or office of the City of St. Louis, which is an organization or government for purposes of applying Title 18, U.S.C., Section 666.

The Treasurer's Office is responsible for maintaining all of the City of St. Louis bank accounts, including the account where the HUD grant funds at issue here were deposited and the account where the City's payroll funds are held and disbursed from, including funds used to pay defendant, Fred Robinson.  When one looks at the information contained on the City of St. Louis

website (attached as Exhibit 1 to Government's Response to Defendant's Motion to Dismiss

(doc. 72) ), one learns that:

> 1.      The Treasurer's Office controls and monitors all the bank
> accounts of the City.  There are currently over 30 accounts under
> this office's control.  Through daily contact with the Comptroller's
> Office and detailed reconciliations of these accounts, this office
> provides a check and balance for the Comptroller's Office.  In
> addition, this office is by ordinance the depository for all receipts
> of the City and provides a means for departments to make daily
> deposits.
>
> 2.      The Treasurer's Office issues all payroll checks, deposits
> funds for federal and state taxes, funds for savings bonds and other
> payroll deductions.
>
> 3.      The Treasurer is also responsible for making all
> investments for the City.  This includes purchasing, selling and
> auditing the earnings on these investments as well as ensuring that
> City funds are safe and secure.
>
> 4.      [The Treasurer's] responsibilities include that of being the
> head of the City's banking systems and parking services operation.
> As head of banking operations, he is responsible for the
> establishment of over fifty different City banking accounts,
> receiving deposits and reinvesting the intake of cash from a variety
> of City sources.  Revenues under the supervision and control of the
> Treasurer exceed $1.5 billion.

In an analogous case, a deputy Treasurer for the State of Oklahoma was found to be an

"agent" of the State of Oklahoma for purposes of applying Title 18, U.S.C., Section 666 despite

her argument that the Oklahoma Treasurer was not an "agent" of the state and the Treasurer's

Office did not directly benefit from the federal funds received by the State of Oklahoma, but

only managed and invested those funds.  *United States v. Pretty*, 98 F.3d 1213 (10th Cir. 1996).

The *Pretty* Court found that the Deputy Treasurer was an agent of the State of Oklahoma, not

merely the Treasurer's Office, because the Treasurer's Office managed and invested the state's

7

funds, not merely the Treasurer's funds.  *Id.* at 1220.  Similarly, the Treasurer of the City of St. Louis is an agent of the City of St. Louis, and those individuals working for his office, including the defendant, are employees of the City of St. Louis for purposes of applying Title 18, U.S.C., Section 666.

Missouri statutes state that "the city treasurer shall be commissioned by the mayor, and shall serve for the term or period in such commission fixed and thereafter until his successor is duly elected or appointed and qualified".  RSMo Section 82.490.  "The city treasurer shall perform such duties as are, or may be, required of him by the general laws of this state, and such duties as are, or may be, required of him by any ordinance or ordinances of any such city not inconsistent or in conflict with any such general law".  RSMo Section 82.510.  "Beginning January 1, 2000, the compensation of the city treasurer may be annually increased by an amount equal to the annual salary adjustment for employees of the city of St. Louis as approved by the board of aldermen.  The salary of the city treasurer, and the salaries of the treasurer's deputies, clerks, and assistants, shall be paid out of the city treasury, in equal semimonthly installments".  RSMo Section 82.520.

The government disagrees with defendant's reliance upon *United States v. Phillips*, 219 F.3d 404 (5th Cir. 2000) and *United States v. Sunia*, 643 F.Supp. 2d 51 (D.C. Cir. 2009) under the facts and circumstances presented in the instant case.  Here, as referenced above, there is a clear nexus between the Treasurer's Office and the City of St. Louis.  The Treasurer's Office manages and invests all of the funds and revenues of the City of St. Louis, including all of the city's bank accounts.  Clearly, unlike the assessor's office in *Phillips*, the Treasurer's Office of the City of St. Louis is "authorized to act on behalf of the [city] with respect to its funds".  The Treasurer's

salary, as well as the salaries of the employees of the Treasurer's Office, are paid out of the revenues of the City of St. Louis.  Defendant Robinson is paid as an employee of the City of St. Louis, out of City of St. Louis bank accounts, and issued W-2 forms by the City of St. Louis as a City of St. Louis employee.  All employment issues relative to defendant Robinson are handled through the use and processing of City of St. Louis personnel forms.  For purposes of applying Title 18, U.S.C., Section 666, defendant Robinson is an employee of the City of St. Louis and, therefore, an agent of the City of St. Louis.

        2.      **Motion to Suppress**.

Defendant Robinson has moved to suppress all evidence derived from the government's GPS Tracker installed without a warrant on defendant's vehicle.  In the First Report and Recommendation (R & R), the Magistrate Judge recommended that this motion be denied. Subsequent to the issuance of that R & R, the United States Supreme Court issued its opinion in *United States v. Jones*, 2012 WL 171117, finding that a warrant was required prior to the installation and use of a GPS Tracker similar to the one used in the instant case.  This Court requested the parties brief this issue in light of the newly issued *Jones* opinion.  Further, following the *Jones* opinion the government sought leave to present additional evidence on the issue of reasonable suspicion and this request was granted by the Magistrate Judge.  The government presented this additional evidence during the April 12, 2012 Hearing.

      A. **Facts Relating To The GPS Tracker**.

This Court should consider the evidence presented during the original December 1, 2011 evidentiary hearing as well as the April 12, 2012 evidentiary hearing.

      1. **December 1, 2011 Hearing**.

9

On or about January 22, 2010, Special Agents of the FBI installed a GPS Tracker on defendant's vehicle while the vehicle was parked on a public street. (12-1-11 Hrg., p. 17)  The GPS Tracker was a small device, had its own battery supply, and was not "hard wired" into defendant's vehicle's battery or electrical system.  (12-1-11 Hrg., p. 16)  The GPS Tracker could not determine who was driving the vehicle, nor make any observations of the interior of the vehicle.  (12-1-11 Hrg., p. 18)  The GPS Tracker operated with an antenna that had to "see the sky" in order to operate, such that the GPS Tracker could not collect and record data if defendant's vehicle was in a garage or other roofed enclosure.  (12-1-11 Hrg., p. 18)  At no time during the period when the GPS Tracker was obtaining and recording data on defendant's vehicle was defendant's vehicle located in a private garage or other enclosure, and the vehicle was always in a location where passers by could physically observe the vehicle.  (12-1-11 Hrg., pp. 20-21)  The GPS Tracker solely obtained and recorded data relative to the movement and location of defendant's vehicle until on or about March 17, 2010, when the device stopped recording and transmitting data and was subsequently removed by FBI Special Agents, again while the vehicle was parked on a public street.  (12-1-11 Hrg., pp. 18-20)

The FBI agents were investigating allegations that defendant Robinson, a purported employee of the St. Louis Treasurer's Office, was in fact not performing any work for that Office, but turning in false weekly time sheets as part of a scheme to defraud and obtain money from that Office.  The agents conducted interviews and also conducted physical surveillance of defendant which substantiated the allegation that defendant was a ghost employee.

> Q.  ...was the initial allegation that you and the other agents
> investigated relative to – well, allegations that this defendant was a
> ghost employee of the St. Louis Treasurer's Office?

A.  Correct, that was the initial allegation that there was a ghost employee on the payroll at the Treasurer's Office.

Q.  Okay, and based on your investigation, did you determine the allegations were specific as to this defendant, Fred W. Robinson?

A.  Yes, we identified the individual, and performed some additional interviews to corroborate that, and then some surveillance.

Q.  So you conducted interviews?

A.  Yes.

Q.  And did you do physical surveillance of the defendant Fred Robinson?

A.  Yes, we did.

(12-1-11 Hrg., pp. 13-14).

Q.  Did your physical surveillance corroborate or substantiate to a certain degree the allegations of the defendant being a ghost employee?

A.  Yes.

(12-1-11 Hrg., pp. 15-16).  One of the reasons for determining to utilize the GPS Tracker was the

agents' concerns that their surveillance agents would be spotted by defendant, as well as the

sheer number of agents required to conduct appropriate surveillance.

Q.  Did you have any concerns regarding your physical surveillance of the defendant?

A.  Yes, in order to be able to cover the time period of what he did during the day, we didn't want to be seen, so it was definitely a concern to be staying on him so that he would see our vehicles.

Q.  Okay, and when you say you conducted periodic surveillance of the defendant, was it more than just you out there as far as agents?

A.  Yes.

11

> Q.  And based upon your observations and your concerns regarding the physical surveillance, did you determine to utilize a GPS, global positioning tracker?
>
> A.  Yes.

(12-1-11 Hrg., pp. 15-16).

> Q.  I mean, approximately how many would be needed in a different – in a day of surveillance?
>
> A.  In an entire day, I would probably call at least five to six agents.

(12-1-11 Hrg., p. 15).

### 2. **April 12, 2012 Hearing**.

During the April 12, 2012 hearing the government presented more detailed testimony concerning the evidence gathered during the investigation prior to placement of the GPS Tracker on defendant's vehicle.

On October 29, 2009, Special Agents of the FBI interviewed Curtis Royston, an individual who had worked at the Treasurer's Office for approximately 13 years prior to his termination during 2009.  (4-12-12 Hrg., pp. 7-9).  Royston, who worked in human resources in the Treasurer's Office, identified defendant Robinson as a Treasurer's Office "ghost employee", an employee who appeared at the office to collect his paycheck but who did not perform any work.  (4-12-12 Hrg., pp. 7, 9).  Royston had a background in computers, and became aware that defendant Robinson was an associate of Treasurer Williams and that the two were involved in a charter school named Paideia Academy.  (4-12-12 Hrg., p. 8).  From time to time, Williams required Royston to travel to an office on Lindell Boulevard and perform work in setting up Paideia's computers during Royston's regular Monday through Friday Treasurer's Office work

12

hours.  (4-12-12 Hrg., p. 8).  It was at the Lindell Boulevard office, while Royston was working on the Paideia computers, that he was introduced to defendant Robinson, who was also working in that Lindell Boulevard office on Paideia matters.  (4-12-12 Hrg., p. 14).

Following the interview of Royston, the FBI verified through State of Missouri wage records that defendant Robinson was employed by the City of St. Louis.  (4-12-12 Hrg., pp. 9-10).[4]  The FBI also reviewed the Paideia Academy website and observed that defendant Robinson was the Chairman of the Board, and Treasurer Williams was a member of the Board.  (4-12-12 Hrg., p. 10).  The FBI agent also obtained from the U.S. Attorney's Office the names of three other individuals who had information regarding the Treasurer's Office; Ben Phillips, Dan Parsons, and Harold Miner.  (4-12-12 Hrg., p. 10).  Further, the FBI determined to conduct surveillance of defendant Robinson and his residence at 8726 Partridge Avenue.  (4-12-12 Hrg., p. 11).

On Tuesday, December 8, 2009, the FBI agent conducted surveillance of defendant's residence and observed defendant leave his residence in a blue Chevrolet Cavalier automobile registered to him at approximately 9:00 a.m.  (4-12-12 Hrg., p. 11).  The agent followed defendant to a local diner, and then to the Paideia Academy where defendant parked his car and entered the administration building.  The agent left the vicinity just after 11:00 a.m. with defendant's car still at the school.  (4-12-12 Hrg., pp. 11-12).  It should be noted that the blue Chevrolet Cavalier automobile driven by defendant is the same automobile that the GPS Tracker was subsequently installed upon.  (4-12-12 Hrg., p. 12).

---

[4] The hearing transcript erroneously indicates that the records reflected that defendant "wasn't" employed by the City of St. Louis, when the agent's testimony was that the records reflected that defendant "was" employed by the City of St. Louis.

13

On Wednesday, December 9, 2009, the FBI conducted additional surveillance and saw defendant's blue Chevrolet Cavalier parked in front of the Paideia administration building at approximately 11:00 a.m., and again at approximately 2:45 p.m.  (4-12-12 Hrg., p. 13).

The FBI re-interviewed Curtis Royston on December 10, 2009 and learned that during his many years at the Treasurer's Office he was not aware of any employee working during the night, but had seen payroll records reflecting defendant Robinson had worked nights, which Royston found suspicious.  (4-12-12 Hrg., p. 14).  Royston reaffirmed that he had never observed defendant perform any work for the Treasurer's Office, and had only seen him come into the office to collect his paychecks.  (4-12-12 Hrg., p. 14).  Royston clarified that the several times he had seen defendant at the Lindell office working on Paideia matters had been during normal work hours, on weekdays between 9:00 a.m. and 5:00 p.m.  (4-12-12 Hrg., p. 15).

On December 14, 2009, FBI interviewed Dan Parsons who had been an auditor with the Treasurer's Office for 21 years until his retirement during 2009.  (4-12-12 Hrg., p. 15).  Parsons was very familiar with all of the employees of the Treasurer's Office, including the parking enforcement division, but had never heard the defendant Robinson's name before when asked by the agent.  When the agent showed Parsons defendant's photograph, he did not recognize defendant.

On December 17, 2009, the FBI interviewed Ben Phillips who had been employed by the Treasurer's Office for approximately 10 years.  (4-12-12 Hrg., pp. 17-18).  Phillips was familiar with defendant Robinson, knew that Robinson and Treasurer Williams were involved in Paideia, had never known defendant Robinson to perform work for the Treasurer's Office, and was surprised to have seen that Williams had approved overtime pay for Robinson.  (4-12-12 Hrg., p.

14

18).  Phillips assumed that Robinson was kicking back money to Williams.  (4-12-12 Hrg., p. 18).

On January 7, 2010, the FBI interviewed Harold Miner, a 35 year veteran employee of the Treasurer's Office who had served as Deputy Director of Operations and oversaw the parking meter collection, maintenance and enforcement functions.  (4-12-12 Hrg., p. 19).  Miner advised that defendant Robinson was one of several individuals employed by the Treasurer's Office, paid by the Treasurer's Office, but who performed no work for the Treasurer's Office.  (4-12-12 Hrg., p. 20).  Miner advised that Robinson turned in time sheets and collected a paycheck, but did not actual work for the Treasurer's Office.  (4-12-12 Hrg., p. 20).

During the week of January 11, 2010, the FBI conducted periodic surveillance several times Monday through Friday and observed defendant Robinson's automobile parked in front of the Paideia administration building.  (4-12-12 Hrg., p. 23).  On three subsequent mornings, Tuesday, Wednesday, and Thursday, January 19, 20, and 21 2010, the FBI conducted surveillance at defendant's residence where they observed his automobile parked in front of the residence between the hours of Midnight and 4:00 a.m.  (4-12-12 Hrg., p. 24).

Based upon their interviews, records checks, and surveillance, the FBI suspected that defendant Robinson was spending time at Paideia, and not performing his job at the Treasurer's Office.  (4-12-12 Hrg., p. 25).

B.    **Legal Discussion**.

Defendant now suggests that the Magistrate Judge's recommendation against suppression of the evidence obtained through use of the GPS Tracker is based solely upon a finding of

reasonable suspicion on the part of the agents.  (Defendant's Objections, p. 11).[5] A thorough

reading, however, of the Magistrate Judge's Second R & R reflects that the recommendation

against suppression was based additionally and, perhaps foremost, upon the Court's

determination that the agents had relied upon and followed binding precedent at the time of the

tracker installation.  (Second R & R, pp. 28-33).  As the Court clearly stated:

> ...the evidence obtained from the warrantless, trespassory
> installation and use of the GPS tracker device should not be
> suppressed, because the officers objectively and reasonably relied
> on binding precedent in believing that they did not need a warrant
> prior to installing the GPS tracker device onto defendant's vehicle
> and using the device to monitor the vehicle's movements.

(Second R & R, p. 33).

The GPS Tracker in the instant case was installed on January 22, 2010, and recorded data

through March 17, 2010.  At that time, the controlling law of the land was that no warrant was

required to install such a GPS Tracker on a vehicle and obtain data concerning that vehicle's

movement on public streets, as no Fourth Amendment right was impinged upon in either the

installation of the tracker or in the actual tracking.

In *United States v. Knotts*, 460 U.S. 276, 281 (1983), the Supreme Court held that a

person traveling in a vehicle on public streets has no reasonable expectation of privacy in his

vehicle's movements from one place to another and, thus, there can be no Fourth Amendment

violation.  In *Knotts*, a radio transmitter placed in container within a vehicle allowed agents to

---

[5] Defendant further suggests that the government has "forfeited any argument that there is probable cause in this situation".  (Defendant's Objections, p. 11).  However, a review of the transcript from the original December 1, 2011 Hearing clearly reflects that, in raising a relevancy objection to defense counsel's questioning, the government was simply arguing that the issue of probable cause was not before the Magistrate Court based upon judicial precedent at the time. (12-1-11 Hrg., p. 26).

trace movements of defendants from Minnesota to Wisconsin.  The Court found that when an individual travels over public streets, he voluntarily conveys to anyone who wants to know, the fact of whatever stops he made, and the fact of his final destination if and when he exited from public roads onto private property.  *Id.*  In *United States v. Karo*, 468 U.S. 705, 715 (1984), the Court found no Fourth Amendment violation where law enforcement placed a radio transmitter in a can that was able to provide location information from within a premises.  Unless the monitoring device reveals "a critical fact" about the interior of a premises and instead only reveals information voluntarily conveyed there is no violation.  *Id.*

Relying upon *Knotts* and *Karo*, the Circuit Courts of Appeals have held specifically in GPS Tracker cases similar to the instant case that such a use does not amount to a search or seizure under the Fourth Amendment.  In *United States v. Garcia*, 474 F.3d 994, 996 (7th Cir. 2007), the Seventh Circuit Court of Appeals found neither a seizure nor a search.  "The defendant's contention that by attaching the memory tracking device the police seized his car is untenable".  *Id.*  "The Supreme Court has held that the mere tracking of a vehicle on public streets by means of a similar though less sophisticated device (a beeper) is not a search".  *Id.*, citing *United States v. Karo*, 468 U.S. 705, 713-14 (1984).  Similarly, in *United States v. Pineda-Moreno*, 591 F.3d 1212 (9th Cir. 2010), the Ninth Circuit Court of Appeals relied upon *Knotts*, *supra*, in concluding that the appellant had no expectation of privacy in the exterior of his vehicle and, therefore, "the police did not conduct an impermissible [Fourth Amendment] search of Pineda-Moreno's car by monitoring its location with mobile tracking devices".  *Id.* At 1217, citing *United States v. McIver*, 186 F.3d 1119 (9th Cir. 1999) (no Fourth Amendment violation where police officers installed and monitored a magnetized tracking device upon appellant's

17

vehicle's exterior).

The Eighth Circuit Court of Appeals decided *United States v. Marquez*, 605 F.3d 604 (8th Cir. 2010) several months *following* the use of the GPS tracker in the instant case and, thus, it was not binding law at the time the agents used the tracker in this case.  However, a review of *Marquez* certainly gives a clear understanding of the view of the applicable law in the Eighth Circuit at the time the GPS tracker was utilized in this case.  It might not have been the "law" of the land, but it gives this Court an understanding of the "lay" of the land in the Eighth Circuit at the pertinent time, and it is consistent with the previously cited cases from the Seventh and Ninth Circuits.  In *Marquez*, our Court of Appeals relied upon *Knotts*, *supra,* in finding that "a person traveling via automobile on public streets has no reasonable expectation of privacy in his movements from one locale to another".  *Id*. at 609.  The *Marquez* Court went on to conclude that when police have reasonable suspicion to believe that a vehicle is involved in criminal activity, "a warrant is not required when, while the vehicle is parked in a public place, they install a non-invasive GPS tracking device on it for a reasonable period of time".  *Id.*  at 610, citing *United States v. Garcia,* 474 F.3d 994 (7th Cir. 2007).

In *Davis v. United States,* 131 S.Ct. 2419 (2011), the Supreme Court examined whether evidence obtained during a vehicle search by officers acting in reliance upon controlling appellate court precedent should be suppressed where, subsequent to the officers' search, the Supreme Court issued an opinion, *Arizona v. Gant*, 129 S.Ct. 1710 (2009), finding that such a search would be in violation of the Fourth Amendment.  The *Davis* Court refused to suppress the evidence, finding that the exclusionary rule does not apply to suppress evidence obtained during a search conducted in reasonable reliance on appellate court precedent.  *Davis*, at 2429.

18

In the instant case, in attaching the GPS tracker to defendant's automobile without a warrant, and tracking the automobile's movements through use of the GPS tracker, the agents relied upon and strictly adhered to then controlling appellate court opinions that addressed the specific issue and which had found no requirement for a court ordered warrant.  *See*, *United States v. Garcia*, 474 F.3d 994, 996-98 (7th Cir. 2007); *United States v. McIver*, 186 F.3d 1119, 1226-27 (9th Cir. 1999); *United States v. Pineda-Morena*, 591 F.3d 1212 (9th Cir. 2010).  At the time the agents here utilized the GPS tracker on defendant's automobile, the government was unaware of any appellate court that had determined that a warrant was required to place such a tracker on a vehicle.  Subsequently, the Eighth Circuit can be found to have ratified the agents' conduct here in a case with markedly similar underlying facts, *United States v. Marquez*, 605 F.3d 604 (8th Cir. 2010), following and applying the logic of the Seventh and Ninth Circuits in finding that a warrant was not required for the placement and use of a GPS tracker.  *See also*, *United States v. Hernandez,* 647 F.3d 216, 220 n.4 (5th Cir. 2011); *United States v. Cuevas-Perez*, 640 F.3d 272, 273 (7th Cir. 2011).  The District of Columbia Circuit Court of Appeals' opinions underlying *Jones* and which found a warrant requirement, *United States v. Maynard,* 615 F.3d 544(D.C. Cir. 2010) and *United States v. Jones*, 625 F.3d 766 (D.C. Cir. 2010) were not issued until approximately seven months *after* the agents here had installed the GPS tracker.

Citing *Davis*, 131 S.Ct. 2429, Magistrate Judge Noce appropriately noted:

> In light of the Supreme Court's opinions in *Knotts* and *Karo*, as interpreted and applied by the Ninth Circuit in *Pineda-Moreno*, the Seventh Circuit in *Garcia*, and subsequently by the Eighth Circuit in *Marquez*, the undersigned concludes that the agents acted in objective, reasonable reliance on binding precedent when they installed and used the GPS tracker device.  As such, the evidence

19

> obtained by using the GPS tracker dev ice should not be
> suppressed.

(Second R & R, p. 32).

The Magistrate Judge also recommended against suppression of the tracker evidence based upon evidence that the agents had reasonable suspicion that defendant Robinson was engaged in criminal conduct, the submission of false time sheets to be paid for work not performed, and that defendant's automobile facilitated the suspected criminal activity. Defendant's argument on this point is simply that the agents relied upon witnesses who were not credible due to a pending lawsuit against the Treasurer relative to their terminations, and such information was insufficient to rise to reasonable suspicion.  Defendant gives short shrift to the information provided by the witnesses, as well as the surveillance and other evidence obtained by the agents.  Further, defendant never explains how an employment lawsuit *against the Treasurer* to which one or more of these witnesses is a current party taints the information and evidence provided by the witnesses to the  agents *relative to the defendant Robinson*.  There is nothing in the record to suggest any bias on the part of the witnesses against defendant Robinson.

The witnesses interviewed by the FBI agents were all longtime employees of the Treasurer's Office, and in positions to have known whether or not defendant Robinson performed the work claimed by Robinson on his timesheets for which he was paid by the City of St. Louis.  Several of them were in positions of supervision and authority within the Treasurer's Office.  They are credible witnesses.  Further, the agents corroborated the information provided by the witnesses through surveillance of the defendant and his automobile which reflected that defendant was not performing work for the Treasurer's Office, but was instead spending his time

20

at the Paideia Academy where the agents verified he was Chairman of the Board.  The agents

also verified and corroborated that he was being paid by the City of St. Louis.  The agents did

not approach defendant's direct supervisor or the Treasurer Williams because they were

concerned that their undercover investigation would be exposed. (4-12-12 Hrg., p. 50).

>     As Magistrate Judge Noce duly noted:

> Reasonable suspicion is a lower threshold than probable cause, and
> it requires considerably less than proof of wrongdoing by a
> preponderance of the evidence.  *United States v. Carpenter*, 462
> F.3d 981, 986 (8th Cir. 2006).  An officer's suspicion is reasonable
> if he knows particularized, objective facts that lead to a rational
> inference that a crime is being or has been committed.  *United
> States v. Gannon*, 531 F.3d 657, 661 (8th Cir. 2008) (quoting
> *United States v. Hernandez-Hernandez*, 327 F.3d 703, 706 (8th Cir.
> 2003).  Whether an officer had a particularized and objective basis
> for suspecting legal wrongdoing is evaluated under the totality of
> the circumstances.  *United States v. Arvizu*, 534 U.S. 266, 273
> (2002).  Reasonable suspicion can be based on hearsay
> information, the tip of a sufficiently reliable informant, or an
> officer's assessment of a situation made from his or her specialized
> training.  *United States v. Robinson*, 670 F.3d 874, 876 (8th Cir.
> 2012); *United States v. Huerta*, 655 F.3d 806, 809-10 (8th Cir.
> 2011).  That any one factor is insufficient to establish reasonable
> suspicion is not dispositive; 'the sum of the factors taken together
> can amount to reasonable suspicion.'  *Huerta*, 655f F.3d at 809.

(Second R & R, pp. 36-37).  Clearly, from the substantial information the agents had learned

from the cooperating witnesses, and the information learned from the records checks and

surveillance, the Magistrate Judge's finding and recommendation that the agents had reasonable

suspicion that defendant Robinson had been and was currently engaged in criminal conduct, and

the agents believed that tracking the movements of his automobile "would enable them to

confirm or dispel their suspicion" is an appropriate and well supported finding and

recommendation.

3.      **Motion To Sever**.

Defendant moved to sever the counts relating to his alleged fraud involving Paideia

Academy from the counts relating to his alleged fraud involving the Treasurer's Office.  The

Magistrate Judge properly determined that the counts need not be severed under Federal Rule of

Criminal Procedure 8(a), as the alleged fraudulent schemes "are of the same or similar

character".  (Second R & R, p. 13).  Citing *United States v. Garrett*, 648 F.3d 618, 625 (8th Cir.

2011), the Magistrate Court determined that counts can be found to be "of the same or similar

character" when they "refer to the same type of offenses occurring over a relatively short period

of time".  *Id.*  The Magistrate Court, applying Rule 8(a) liberally, found that "all of the counts in

the indictment are of a similar character (obtaining money by fraudulent activity) and the

allegations in the indictment temporally overlap".  *Id.*  Thus, the Magistrate Court deemed

joinder proper.  As the government argued at the motion hearing, the government's evidence will

overlap substantially in showing that, during the very time that defendant was engaged in his

fraudulent scheme involving Paideia to obtain money, defendant was involved in his fraudulent

scheme to obtain money from the Treasurer's Office.  The government's allegation is that while

defendant  was supposed to be performing work for the Treasurer's Office, he was actually at

Paideia engaging in a fraudulent scheme to obtain money and funds for a child care center in

which he held ownership.  These basic schemes are set forth in the Indictment.  Many of the

same witnesses will be called to testify relative to both the Paideia scheme and the Treasurer's

Office scheme.  As Magistrate Judge Noce noted, "joint trials are favored because they 'conserve

state funds, diminish inconvenience to witnesses and public authorities, and avoid delays in

bringing those accused of crime to trial'".  (Second R & R, p. 14, citing *United States v. Lane*,

22

474 U.S. 438, 449 (1986)).  The government submits that any minimal prejudice to defendant

caused by a joint trial can be adequately dealt with by this Court through *voir dire*, appropriate

jury instructions and appropriate jury admonitions during the trial.

## CONCLUSION

For the foregoing reasons, the Magistrate Judge's Second Report and Recommendation

should be adopted by this Court, and defendant Robinson's various pretrial motions should be

denied.

Respectfully submitted,
RICHARD G. CALLAHAN
UNITED STATES ATTORNEY

     /s/ Hal Goldsmith
ASSISTANT UNITED STATES ATTORNEY
111 South 10th Street, Suite 20.333
St. Louis, Missouri 63102
314.539.2200
hal.goldsmith@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on July 12, 2012, the foregoing was filed electronically with the Clerk of the
Court to be served by operation of the Court's electronic filing system upon the following:

Felicia Jones, Assistant Federal Public Defender.

     /s/ Hal Goldsmith
ASSISTANT UNITED STATES ATTORNEY